## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **PNC BANK, N.A., a national banking association,** )<br>)<br>) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** )<br>) | |
| **PRESBYTERIAN RETIREMENT CORPORATION, INC. d/b/a WESTMINSTER VILLAGE and THE SPECIAL CARE FACILITIES FINANCING AUTHORITY OF THE CITY OF DAPHNE,** )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **CIVIL ACTION NO.: 1-14-cv-00461** |
| **Defendants.** ) | |

## COMPLAINT SEEKING PAYMENT OF CONTRACTUAL DEBT, RECOVERY OF COLLATERAL, AND FOR APPOINTMENT OF A RECEIVER

## SUMMARY OF CASE

PRC is in payment default on its indebtedness to PNC Bank, which indebtedness is secured by substantially all of PRC's assets.  PRC runs a Continuing Care Retirement Community (a "CCRC") known as Westminster Village in Spanish Fort, Alabama which provides about 250 cottages and apartments for independent living, 26 assisted living beds, and 60 nursing home beds.  The paramount interest of all concerned is to provide adequate health care

and related services to all residents and patients.  Therefore, PNC Bank seeks the appointment of a receiver to run the business as a going concern while a going concern buyer is found for the facility.  New money may be needed to fund operations of the CCRC before a sale closes.

## OPENING

COMES NOW, PNC Bank, N.A., a national banking association ("PNC Bank" or "Plaintiff"), and for its Complaint against defendants Presbyterian Retirement Corporation, Inc. d/b/a Westminster Village, an Alabama non-profit corporation ("PRC"), and The Special Care Facilities Financing Authority of the City of Daphne, an Alabama public corporation (the "Authority," and together with PRC, the "Defendants"), and together with *PNC Bank's Submission of Documentary Evidence* (the "Evidentiary Submission"), filed contemporaneously herewith, PNC Bank states as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      PNC Bank is a national bank chartered under the laws of the United States, with its home office, as set forth in its articles of association, located in the State of Delaware.  The principal place of business of PNC Bank is the Commonwealth of Pennsylvania.

2.      PRC is a non-profit corporation organized under the laws of the State of Alabama with its principal place of business located in Baldwin County,

Alabama.  PRC is an independent corporation not connected with any church or other entity.

3.     The Authority is a public corporation organized under the laws of the State of Alabama with its principal place of business located in Baldwin County, Alabama.   The Authority is a joint mortgagor on the below-described mortgage. The Authority is named as a defendant primarily to make sure that PNC Bank can obtain the complete relief it seeks herein.   PNC Bank does not seek money damages against the Authority.

4.     The CCRC, owned by the Authority and leased to and operated by PRC, which is the subject of this dispute, is located in Baldwin County, Alabama.

5.     The amount in controversy, exclusive of interest and costs, exceeds $75,000.

6.     This Court has original jurisdiction of this case pursuant to 28 U.S.C. § 1332.

7.     Defendants are subject to personal jurisdiction in this judicial district because, *inter alia*, they are domiciled in the State of Alabama and part of the Collateral which is the subject of this dispute is located in Baldwin County, Alabama.

8.     Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b)(1) and (2), as Defendants reside in this judicial district, a substantial part

of the events or omissions giving rise to the claims asserted herein occurred in this judicial district, and virtually all of the Collateral that is the subject of this action is situated in this judicial district.

## NATURE OF ACTION

9.      PNC Bank is the holder of certain notes issued by and bonds issued to Defendants, which are secured by, among other things, a mortgage and security interest on substantially all of the property owned by the Authority and leased to and operated by PRC.  The property securing the notes and bonds is located in Baldwin County, Alabama.  PRC defaulted under the terms of the bond documents by, *inter alia*, failing to pay back the bonds when tendered and breaching financial and reporting covenants.  PNC Bank files this complaint to enforce its rights and remedies under the governing bond documents, in order to recover the amounts owing under the bond documents, and to preserve and enhance the value of the property securing the notes and bonds.  PNC Bank also seeks the appointment of a receiver for the property securing the notes and bonds.

## FACTUAL ALLEGATIONS

### A.      PRC's Financial Obligations to PNC Bank

10.    Since at least the 1980s, PRC has operated a CCRC in Spanish Fort, Alabama, known as the Westminster Village.   Westminster Village has approximately 250 independent living apartments or cottages, 26 assisted living beds, and 60 nursing home beds.

11.     On or about December 1, 2005, the Authority issued that certain $6,000,000 Revenue Bond (Presbyterian Retirement Corporation, Inc.), Series 2005, as amended by that certain First Amendment to the Special Care Facilities Financing Authority of the City of Daphne Revenue Bond (Presbyterian Retirement Corporation, Inc.), Series 2005, dated August 16, 2011, as further amended by that certain Second Amendment to the Special Care Facilities Financing Authority of the City of Daphne Revenue Bond (Presbyterian Retirement Corporation, Inc.), Series 2005 dated March 15, 2013 (as so amended, the "2005 Bond"), which was issued pursuant to that certain Financing Agreement dated December 1, 2005, as amended by that certain First Amendment to Financing Agreement dated August 16, 2011, as further amended by that certain Second Amendment to Financing Agreement dated March 15, 2013 (as so amended, collectively the "2005 Financing Agreement").   *See* Evidentiary Submission, Exs. 1–6.

12.     Thereafter, on or about September 1, 2006, the Authority issued that certain $5,500,000 Revenue Bond (Presbyterian Retirement Corporation, Inc.), Series 2006, as amended by that certain First Amendment to the Special Care Facilities Financing Authority of the City of Daphne Revenue Bond (Presbyterian Retirement Corporation, Inc.), Series 2006, dated August 16, 2011, as further amended by that certain Second Amendment to the Special Care Facilities

Financing Authority of the City of Daphne Revenue Bond (Presbyterian Retirement Corporation, Inc.), Series 2006 dated March 15, 2013 (as so amended, the "2006 Bond" and, together with the 2005 Bond, the "Bonds"), which was issued pursuant to that certain Financing Agreement dated September 1, 2006, as amended by that certain First Amendment to Financing Agreement dated August 16, 2011, as further amended by that certain Second Amendment to Financing Agreement dated March 15, 2013 (as so amended, collectively the "2006 Financing Agreement" and, together with the 2005 Financing Agreement, the "Financing Agreements").  *See* Evidentiary Submission, Exs. 7–12.

13.    On July 1, 2013, PNC Bank sent PRC those certain Optional Tender Notices (the "Optional Tender Notices," and singly, an "Optional Tender Notice"), whereby PNC Bank elected to waive the automatic exercise of the optional tenders of the Bonds, subject to the conditions or limitation set forth on Annex 1 attached thereto.  Also on July 1, 2013, PRC executed those certain Acknowledgement and Agreement of PRC forms, acknowledging receipt and acceptance of each Optional Tender Notice.  *See* Evidentiary Submission, Ex. 13.

14.    The Bonds were issued to PRC, and are now held by PNC Bank, as successor to RBC Bank (USA), as successor to AmSouth Bank.

15.    PNC Bank holds those certain notes (the "Notes") made payable to PNC Bank in amounts equal to the Bonds and certain interest payments due on the Bonds.  *See* Evidentiary Submission, Ex. 14.

16.    PNC Bank and PRC are parties to that certain ISDA Master Agreement (and related Schedule) dated as of December 16, 2005 (the "ISDA Master Agreement"), as supplemented by that certain Confirmation Letter dated December 1, 2008, Reference No. 1586577/1639727, and that certain Confirmation Letter dated December 1, 2008, Reference No. 1586591/1639747 (collectively, the "Confirmations"), transferred to RBC Bank as evidenced by that certain letter dated February 21, 2007 (the "Transfer Letter") and acknowledged by that certain letter dated July 22, 2011 (the "Acknowledgement" and with the ISDA Master Agreement, the Confirmations, and the Transfer Letter, collectively the "Swap Documents").  *See* Evidentiary Submission, Exs. 15–19.

17.    The Notes and Bonds are secured by that certain Mortgage and Security Agreement dated December 1, 2005 given by the Defendants in favor of AmSouth Bank, recorded in the Office of the Judge of Probate of Baldwin County, Alabama (the "Recording Office") in Instrument No. 944604, as amended by that certain First Amendment to Mortgage and Security Agreement dated September 1, 2006 and recorded in the Recording Office in Instrument No. 1004256, as amended by that certain Second Amendment to Mortgage and Security Agreement

dated August 16, 2011 and recorded in the Recording Office in Instrument No. 1302444 (as amended, the "Mortgage"). *See* Evidentiary Submission, Exs. 20–22. PNC Bank is now the mortgagee under the Mortgage. Appropriate financing statements covering the personal property collateral are also filed with the filing office with the Alabama Secretary of State (the "UCC Financing Statements"). *See* Evidentiary Submission, Ex. 23. The Financing Agreements, Optional Tender Notices, Notes, Mortgage, and Financing Statement, together with all other documents and instruments evidencing and/or securing or relating to the Bonds, including applicable Swap Documents, are referred to herein as the "Bond Documents." The Mortgage secures, among other things, the property upon which the CCRC is located (the "Property" and together with the other collateral secured by the Bond Documents, the "Collateral"). *See* Evidentiary Submission, Ex. 20, art. 2.

18.    Infirmary Health Systems, Inc. ("IHS") is a contingent secured creditor of PRC. PRC currently owes a substantial amount to Regions Bank ("Regions") on another series of bonds (the "Other Bonds"). Regions' only collateral for the Other Bonds is a guaranty of the Other Bonds from IHS. IHS holds a contingent mortgage and security agreement from PRC to secure its guaranty in the event IHS is required to and does honor its guaranty to Regions.

19.   PNC Bank and IHS are parties to that certain Intercreditor Agreement dated December 1, 2005 (as amended, the "Intercreditor Agreement"), which provides that the mortgage that IHS has on the Property and the Mortgage are neither superior nor inferior to each other, and shall rank in *pari passu* per the terms of the Intercreditor Agreement.   The Intercreditor Agreement further describes IHS and PNC Bank's obligations to one another with respect to the Bond Documents.

20.   The Intercreditor Agreement provides the following regarding third party beneficiaries:

> This Agreement is made solely for the benefit of the Mortgagees and their respective successors and assigns, and no other person or entity is intended to be a beneficiary of any provision hereof, nor shall any such person or entity have any right, benefit, priority or interest under or because of this Agreement.

### B.   PRC's Defaults on Obligations Held by PNC Bank

21.   Multiple events of default, as described in more detail below, have occurred under the Bond Documents.   First, PRC failed to pay the amounts owing under the Bond Documents when due.   Second, PRC failed to comply with certain reporting requirements under the Bond Documents.   Third, PRC failed to allow PNC Bank to examine PRC's books and records, as is required under the Bond Documents.   (Although PRC has recently provided PNC Bank with some financial information, PRC has not provided all of the information that it is required to

provide and has stated that it does not intend to provide additional information to PNC Bank.) Fourth, PRC failed to honor certain financial covenants as required under the Bond Documents. All of these failures constitute events of default under the Bond Documents.

22. PNC Bank waived the optional tender of the Bonds on July 1, 2013.

23. The Bonds were automatically tendered on January 1, 2014. PRC defaulted in the payment of the Bonds, giving rise to a default under the Bond Documents. The failure to pay as required by the Bond Documents, and other various defaults (collectively the "Defaults"), are considered "Events of Default" as defined in the Bond Documents.

24. Effective from the tender date of January 1, 2014, PNC Bank is charging PRC the post-default rate of interest, as such rate is described in the Bond Documents, which increases the existing LIBOR-Based Rate by an additional 2% per annum (the "Post-Default Rate").

25. PRC has been provided with written notices of the default(s), as evidenced by that certain notice of default letter dated January 15, 2014 (the "Initial Default Letter"), that certain notice letter dated March 20, 2014 (the "Set-Off Notice"), that certain reservation of rights letter dated April 3, 2014 (the "Swap Reservation of Rights Letter"), that certain notice of default rate dated May 7, 2014 (the "Default Rate Letter"), that certain notice dated June 10, 2014 (the "Swap

Termination Notice"), that certain notice dated June 17, 2014 (the "Swap Amount Due Notice," and, together with the Initial Default Letter, the Set-Off Notice, the Swap Reservation of Rights Letter, the Default Rate Letter, and the Swap Termination Notice, the "Demand Letters").  *See* Evidentiary Submission, Exs. 24–29.

26.    PNC Bank also sent to Defendants that certain notice to PRC of exercise of remedies dated June 13, 2014, and that certain notice to the Authority of exercise of remedies dated June 13, 2014.  *See* Evidentiary Submission, Exs. 31, 32.

27.    The Defaults currently exist and have not been cured by PRC.

28.    Further, pursuant to the Financing Agreements, PRC agreed to timely provide to PNC Bank any such financial or other information as PNC Bank may reasonably request.  *See* Evidentiary Submission, Exs. 4–6, 10–12.  PRC failed to provide PNC Bank reasonable access to PRC's facilities, books, and records.  PRC would indicate that access would be provided, but then would impose an unacceptable restriction on PNC Bank in order to grant access.

29.    Due to the Defaults, on or about March 20, 2014, PNC Bank exercised certain set-off and liquidation rights that it had with respect to a certain money market account, a certificate of deposit account, and pledged securities account by setting off and liquidating these accounts in the approximate amount of

$1,715,346.47. PRC has since claimed that $73,144.12 of the amounts set-off were actually benevolent funds not subject to set-off. PNC Bank requested proof of such improper set-off, but to date PRC has not provided any proof of PRC's position that PNC Bank's set-off was improper.

30.    Further, due to the Defaults, PNC Bank reserved its rights with respect to the Swap Documents and accordingly issued the Swap Reservation of Rights Letter. PRC was then already in default on the Swap Documents by virtue of cross-default provisions with the Financing Agreements. PRC failed to make a payment when due under the Swap Documents. Thereafter, PNC Bank issued the Swap Termination Notice and Swap Amount Due Notice, by which PNC Bank exercised its rights and remedies with respect to the Swap Documents. In the Swap Amount Due Notice sent to counsel for PRC, PNC Bank informed PRC that the amount due under the Swap Documents was $1,339,147.42, with interest continuing to accrue (the "Amount Due on the Swaps"). *See* Evidentiary Submission, Ex. 29.

31.    In late 2013 and into 2014, PRC tried to refinance its obligations to PNC Bank and Regions Bank to put PRC in a better financial position. PRC was unable to obtain that refinancing.

32.     PNC Bank and its professionals have had numerous conversations and communications with PRC and its professionals in an attempt to resolve their differences.  Those discussions have not resulted in an agreement.

### C.     PNC Bank's Remedies

33.     These Defaults entitle PNC Bank to exercise other rights and remedies under the Bond Documents, including the right to the appointment of a receiver.

34.     More specifically, Section 8.03 of the Mortgage expressly establishes PNC Bank's contractual right to a receiver:

> The Bondholder shall be entitled, as a matter or [sic] right, upon bill filed or other proper legal proceedings being commenced for the foreclosure of this Mortgage, to the appointment by any competent court or tribunal, without notice to the Mortgagors or any other party, of a receiver of the rents, issues and profits of the Collateral, with power to lease and control the Collateral and with such other powers as may be deemed necessary.

*See* Evidentiary Submission, Ex. 20, § 8.03.

35.     On or about October 2, 2014, PNC Bank commenced power of sale foreclosure proceedings against the Defendants by issuing for publication a notice of foreclosure (the "Foreclosure Notice"), setting a foreclosure date of March 27, 2015.  *See* Evidentiary Submission, Ex. 30.

36.     The principal amount outstanding on the Bonds as of September 18, 2014, exclusive of expenses of collection, attorneys' fees and the costs of this action, is $6,852,399.53.  Interest accrues daily at the Post-Default Rate provided

in the Bond Documents.   Attorneys' fees and other costs of collection also continue to accrue (collectively, the "<u>Amount Due on the Bonds</u>").

37.   The Amount Due on the Swaps as of September 18, 2014, exclusive of expenses of collection, attorneys' fees and the costs of this action, is $1,356,868.19.   Interest accrues daily at the Post-Default Rate provided in the Bond Documents.   Attorneys' fees and other costs of collection also continue to accrue.

### D.   <u>Need for a Receiver</u>

38.   PNC Bank is concerned that the residents and patients of the CCRC receive appropriate treatment and services.   PRC's financial condition is unstable. PRC previously stated that it will run out of cash at some point in August or September.   It has more recently acknowledged that it is able to pay most of its bills at this moment through an accommodation from IHS.   However, IHS has stated that such accommodation will not continue unless PNC Bank makes a similar accommodation, which PNC Bank is not willing to do because of the terms that PRC has placed on the proposed accommodation.   PRC will soon not be able to pay its operating bills.

39.   On October 23, 2013, the federal Department of Health and Human Services, Centers for Medicare & Medicaid Services, inspected the CCRC and gave it an Overall Rating of 2 stars, out of a total of 5 stars, which is a "below

average" rating.  The inspection results indicate that the standards of the CCRC are deteriorating.

40.    The Overall Rating is based on the Health Inspection, Staffing, and Quality Measures ratings combined into one.  The Health Inspection rating is "based on the nursing home's health inspection results."  The Staffing rating is "based on the nursing home's staffing hours for Registered Nurses, Licensed Practical Nurses, Licensed Vocational Nurses, and Certified Nursing Assistants." The Quality Measures rating is "based on resident assessment data that show how well the nursing home cares for residents' needs.  *See* Nursing Home Profile, http://www.medicare.gov/nursinghomecompare/search.html          (search          for Westminster Village) (last visited Sept. 16, 2014).

41.    The CCRC remains in operation.  The CCRC should have a greater value as a going concern than if it were closed, and thus, the value of the Collateral should be worth more if the CCRC remains open.

42.    It is apparent that the Property has been mismanaged, resulting in injury to and waste of the Property.  In order for the Property to remain viable and sustain its value, a receiver is necessary to manage the Property, including the CCRC.  Additionally, a receiver is needed to market the Property for a potential sale to maximize the value of the Property.  Without a receiver to oversee the Property, PRC's financial inability to fulfill its responsibilities will continue to

negatively impact the viability and value of the Property to the detriment of PNC Bank. The full extent of the problems will likely not be discovered until the receiver is granted full access to the Property.

43.    PRC has deferred maintenance and improvement work for some time due to financial exigencies. A number of the independent living cottages are uninhabitable because PRC has not maintained them.

44.    PNC Bank is willing to consider advancing funds to maintain operations of the CCRC, but only on certain terms and conditions and only to an independent receiver for the Property acceptable to PNC Bank.

45.    Without a receiver to manage the Property, PNC Bank will continue to suffer substantial damages as the Property will decline in value.

46.    The Property has earnings potential, but a receiver is necessary to stop the further deterioration of the value of the Property.

47.    Accordingly, it is imperative that the receiver have authority and control of all of the aspects of the Property in order to fully preserve the going concern nature of the CCRC, the Collateral, and PNC Bank's rights under the Bond Documents, all with due regard to the rights of other creditors, the residents, and the patients.

## <u>COUNT ONE - BREACH OF CONTRACT</u>

48.     PNC Bank incorporates and realleges the preceding paragraphs as if fully set forth herein.

49.     The Notes were due and owing and the Bonds were tendered for payment as of January 1, 2014.

50.     Despite demand by PNC Bank, PRC did not pay the Notes or Bonds.

51.     PRC is in default on its obligations to PNC Bank, the holder of the Notes and Bonds, to pay in full all the indebtedness due and owing under the Bond Documents, including interest, attorneys' fees and costs, and all other charges thereunder.

**WHEREFORE,** PNC Bank demands judgment against PRC for the Amount Due on the Bonds and costs, as well as such other, further, and different relief to which PNC Bank may be entitled and is just and proper in this action.

## <u>COUNT TWO: PAYMENT OF SWAP DOCUMENTS</u>

52.     PNC Bank incorporates and realleges the preceding paragraphs as if fully set forth herein.

53.     PRC is in default on payment of the now terminated Swap Documents.

54.     Despite demand by PNC Bank, PRC did not pay the Amount Due on the Swaps.

**WHEREFORE,** PNC Bank demands judgment against PRC for the Amounts Due on the Swaps and costs, as well as such other, further, and different relief to which PNC Bank may be entitled and is just and proper in this action.

## COUNT THREE: APPOINTMENT OF RECEIVER IN EQUITY

55.    PNC Bank incorporates and realleges all preceding paragraphs as if fully set forth herein.

56.    In addition to PNC Bank's express contractual right to the appointment of a receiver at law, there are additional equitable considerations which support the appointment of a receiver in equity to manage and operate the Collateral, including the CCRC.  In light of PRC's ongoing payment default, it is clear that PRC does not have sufficient funds to pay the amounts due and owing under the Notes or Bonds, and PRC has stated that it does not have sufficient funds to repay its obligations.  Accordingly, if the Collateral is not preserved, PNC Bank and all other creditors of PRC will be left with no adequate legal remedy to redress the harm arising from PRC's breach of the Bond Documents.  The potential harm to PNC Bank and PRC's other creditors, outweighs any conceivable harm to the Defendants.

57.    In addition and more importantly, PRC's inability to pay its debts as they come due could harm patient and resident care at the CCRC.  The Court needs to supervise the CCRC through the appointment of a receiver in equity to ensure

that patient care continues unabated and is perhaps even advanced through the appointment of a receiver.

58.     PNC Bank offers to do equity.

59.     In the event PNC Bank is not entitled to a receiver as a legal remedy, then PNC Bank would have no adequate remedy at law.

**WHEREFORE**, PNC Bank demands judgment against Defendants for the appointment of a receiver in equity under terms substantially similar to those in the proposed order attached to the Receiver Motion, as well as such other, further, and different relief to which PNC Bank may be entitled and is just and proper in this action.

## COUNT FOUR: APPOINTMENT OF A RECEIVER AT LAW

60.     PNC Bank incorporates and realleges all preceding paragraphs as if fully set forth herein.

61.     In addition to PNC Bank's right to have a receiver appointed as a matter of equity, PNC Bank has the right to the appointment of a receiver at law through its contractual rights.

62.     Section 8.03 of the Mortgage provides as follows:

The Bondholder shall be entitled, as a matter or [sic] right, upon bill filed or other proper legal proceedings being commenced for the foreclosure of this Mortgage, to the appointment by any competent court or tribunal, without notice to the Mortgagors or any other party, of a receiver of the rents, issues and profits of the Collateral, with

power to lease and control the Collateral and with such other powers as may be deemed necessary.

63.     PNC Bank has commenced a power of sale foreclosure of the Mortgage.

64.     PRC is in default on its obligations under the Bond Documents and an Event of Default (as defined in the Mortgage) exists.  PNC Bank is contractually entitled to the immediate appointment of a receiver.

**WHEREFORE,** PNC Bank demands judgment against Defendants for the appointment of a receiver under terms substantially similar to those in the proposed order attached to the Receiver Motion until otherwise ordered, as well as such other, further, and different relief to which PNC Bank may be entitled and is just and proper in this action.

/s/Michael L. Hall
Michael L. Hall (HALLM8891)
Heather A. Lee (LEEHE6873)

Attorneys for Plaintiff
PNC BANK, N.A.

**OF COUNSEL:**

BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama 35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100
Email: mhall@burr.com

hlee@burr.com

**DEFENDANTS' ADDRESSES:**

Presbyterian Retirement Corporation, Inc. d/b/a Westminster Village
c/o Robert Rouse, its Officer
500 Spanish Fort Boulevard
Spanish Fort, Alabama 36527

The Special Care Facilities Financing Authority of the City of Daphne
c/o Rebecca A. Hayes, Clerk
City Hall
1075 Main Street
P O Box 400
Daphne, Alabama 36526

With a courtesy copy via certified mail to:

Patrick Darby
Bradley Arant Boult Cummings LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama 35203

Richard C. Lacey
P.O. Drawer 1437
Fairhope, Alabama 36533

Robert S. Edington
551 Church Street
Mobile, Alabama 36602