IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| PNC BANK, N.A., | ) |
| Plaintiff, | ) ) ) |
| v. | ) CIVIL ACTION 14-0461-WS-C ) |
| PRESBYTERIAN RETIREMENT CORPORATION, INC., *et al.*, | ) ) ) |
| Defendants. | ) ) |

# ORDER

This matter comes before the Court on plaintiff PNC Bank's Motion for Appointment of Receiver (doc. 3). The Motion has been briefed extensively and is now ripe for disposition.[1]

## I. Background Facts.[2]

Defendant Presbyterian Retirement Corporation, Inc. ("Presbyterian") owns and operates Westminster Village, a not-for-profit continuing care retirement community located in Spanish

---

[1] The Court in its discretion takes the Motion for Appointment of Receiver under submission without a hearing. *See generally Citronelle-Mobile Gathering, Inc. v. Watkins*, 934 F.2d 1180, 1189 (11th Cir. 1991) ("there is no general requirement of a hearing in Rule 66, and the court may approve of the appointment of a receiver without a hearing where the record discloses sufficient facts to warrant it"); *Sterling Sav. Bank v. Citadel Development Co.*, 656 F. Supp.2d 1248, 1260 (D. Or. 2009) ("Here, a formal evidentiary hearing is not required. Sterling and the Defendants have both received notice that the court is considering the appointment of a receiver, and both parties have had an opportunity to submit, and have submitted, evidence to the court."); *United States v. Bonanno Organized Crime Family of La Cosa Nostra*, 683 F. Supp. 1411, 1452 n.32 (E.D.N.Y. 1988) ("an evidentiary hearing is not always essential to decide a motion for a preliminary injunction or the appointment of a receiver"). At any rate, no party has asserted that conducting an evidentiary hearing on the Motion might be necessary or appropriate to resolve credibility disputes or supplement the voluminous written record the parties have already filed.

[2] This section provides necessary context to analyze the Motion, and is culled from the pleadings and other court filings. It is not, however, intended to be a formal, definitive, binding set of factual findings to govern this litigation. All parties remain free to contest any and all statements of fact herein as this action progresses.

Fort, Alabama.[3] Back in 2005 or thereabouts, Presbyterian borrowed large sums of money from the predecessor in interest of plaintiff, PNC Bank, N.A. On or about January 1, 2014, PNC Bank tendered certain bonds to Presbyterian, thereby accelerating Presbyterian's obligations and triggering a balloon payment in excess of $8 million. Although it had been making regular debt service payments, Presbyterian was unable to satisfy the required balloon payment. Westminster Village was part of the collateral securing those debt obligations, and PNC Bank holds a security interest in that facility pursuant to a December 2005 mortgage granted by Presbyterian.

In early October 2014, with Presbyterian's failure to make payment constituting a default and the parties unwilling or unable to negotiate a business resolution, PNC Bank filed suit against Presbyterian in this District Court. The Complaint pleads four causes of action, including claims sounding in breach of contract (Count One), payment of swap documents (Count Two), appointment of a receiver in equity (Count Three), and appointment of a receiver at law (Count Four). (*See* doc. 1.) Contemporaneously with its Complaint, PNC Bank filed a 25-page Motion for Appointment of Receiver (doc. 3), a 16-page supporting Brief (doc. 4), and more than 500 pages of exhibits (doc. 2).[4] In this Motion, PNC Bank asserts that both contractual and equitable considerations justify the requested relief.

---

[3] Westminster Village consists of a 56-acre campus, featuring roughly 260 independent living units, 12 independent living medical units, 14 assisted living units and 60 skilled nursing beds. The independent living facilities at Westminster Village include 25 quadraplex cottage buildings and a three-story apartment building, as well as a fitness center, indoor pool, library, arts and crafts areas, billiards room, and chapel. (*See* doc. 32, at 24-25.)

[4] PNC Bank also filed a Motion for Expedited Hearing (doc. 5) on its request for appointment of receiver, citing what it called an "urgent" need for expedited ruling and requesting that a hearing be convened within a week's time. By Order (doc. 9) entered on October 7, 2014, the Court denied the request for expedited hearing, based on determinations including the lack of proof of imminent injury to or waste of the property, as well as the obvious benefit to all concerned (creditors, debtor and Westminster Village residents alike) in having the issue briefed and decided thoughtfully, rather than via a kneejerk ruling on a fragmentary record following a hastily-called hearing for which other parties would have had minimal time to prepare and present a reasoned response to the Motion for Appointment of Receiver. The October 7 Order emphasized, however, that "the Court will not allow the Motion for Appointment of Receiver to languish" (doc. 9, at 6), and entered an accelerated briefing schedule to facilitate disposition of the Motion in a timely fashion.

On the contractual side, PNC Bank relies on a Mortgage and Security Agreement (the "Mortgage") dated December 1, 2005. (*See* North Aff. (doc. 2, Exh. A) at Exh. 20.) In the Mortgage, Presbyterian agreed as follows:

> "If an Event of Default exists, the Bondholder, in lieu of or in addition to exercising the power of sale hereinafter given, may proceed by suit for a foreclosure of its lien on and security interest in the Collateral, to sue [Presbyterian] for damages on account of or arising out of said default or breach …. The Bondholder shall be entitled, as a matter or [*sic*] right, upon bill filed or other proper legal proceedings being commenced for the foreclosure of this Mortgage, to the appointment by any competent court or tribunal, without notice to the Mortgagors or any other party, of a receiver of the rents, issues and profits of the Collateral, with power to lease and control the Collateral and with such other powers as may be deemed necessary."

(Mortgage (doc. 2, Exh. A at Exh. 20), § 8.03.) PNC Bank, as the "Bondholder" within the meaning of § 8.03, maintains that it is contractually entitled to appointment of a receiver for Westminster Village, inasmuch as Presbyterian is in default of its bond payment obligations and PNC Bank is exercising its power of sale, having noticed a foreclosure sale for Westminster Village to occur on March 27, 2015 at the main entrance to the Courthouse of the City of Bay Minette, Alabama. (*See* doc. 2, Exh. A at Exh. 30 (Notice of Mortgage Foreclosure Sale).)[5]

In addition to this contractual basis for the appointment of a receiver, PNC Bank cites as equitable grounds for such relief the following: (i) PNC Bank's contention that Westminster Village is "diminishing in value" because substandard health care services are being provided, Presbyterian is cash-strapped and therefore unable to operate the facility properly, and "many of the independent cottages are uninhabitable" because Presbyterian has failed to maintain them; (ii) PNC Bank's contention that it lacks an adequate remedy at law because any money judgment against Presbyterian may not be collectable and "a foreclosure without other additional relief would directly impact the residents and patients" of Westminster Village; (iii) PNC Bank's contention that it "will suffer irreparable harm if [Presbyterian] remains in control" of the facility and that Westminster Village residents and patients will likewise be irreparably harmed because of Presbyterian's purported "inability to meet certain standards in the provision of health care

---

[5] This Notice of Mortgage Foreclosure Sale reflects that it was to be published in *The Courier* (a newspaper of general circulation in Fairhope, Alabama) on October 7, 2014; October 14, 2014; and October 21, 2014.

services;" (iv) PNC Bank's contention that it is substantially likely to succeed on the merits; and (v) PNC Bank's contention that the public interest favors appointment of a receiver to protect Westminster Village's residents and patients. (*See* doc. 4, at 8-16.)

Presbyterian opposes the Motion for Appointment of Receiver on both legal and equitable grounds, challenging the facts and law on which PNC Bank purports to rely. (*See* doc. 18.) Also opposing the Motion is intervenor-defendant Infirmary Health System, Inc. ("Infirmary Health"), citing not only legal and equitable considerations similar to those identified by Presbyterian, but also alleged breaches of an Intercreditor Agreement between PNC Bank and Infirmary Health. In its filings, Infirmary Health maintains that back in 1998, it entered into an agreement whereby it guaranteed that Presbyterian would repay certain loan obligations (distinct from the PNC Bank loans/bonds). At that time, Presbyterian promised to reimburse Infirmary Health for sums paid out under the guaranty, and granted Infirmary Health a mortgage and security interest in Westminster Village and other collateral. According to Infirmary Health, Presbyterian defaulted on its bond obligations, prompting Infirmary Health to pay out more than $13 million under the guaranty agreement; however, Presbyterian has been unable to reimburse those funds. Thus, Infirmary Health is a secured creditor of Presbyterian and a mortgagee on the very property (Westminster Village) for which PNC Bank seeks appointment of a receiver on this property. Infirmary Health (which was granted leave to intervene as a party defendant via Order (doc. 33) entered on November 4, 2014) expresses strident opposition to the appointment of a receiver in this case on a variety of grounds. Among other reasons, Infirmary Health contends that the Motion should be denied because its lien on the property is senior to PNC Bank's, and that PNC Bank's conduct in this action violates the Intercreditor Agreement signed by Infirmary Health and PNC Bank's predecessor back in December 2005.[6]

---

[6] In particular, the portion of the Intercreditor Agreement highlighted by Infirmary Health provides as follows: "Prior to exercising any right or remedy that either of the Mortgagees may have with respect to the Collateral, … each of the Mortgagees covenants and agrees that any payment, distribution, compromise, settlement or the taking of any other action relating to the exercise of any right or remedy that either of the Mortgagees may have with respect to the Collateral shall be mutually agreed upon in writing by each of the Mortgagees. … [T]o the extent that [PNC Bank] and [Infirmary Health] cannot reach a mutual agreement with respect to said action within a reasonable period of time …, the parties hereto hereby agree to promptly submit such dispute to arbitration." (Doc. 11, Exh. G, § 4.) Infirmary Health maintains that PNC Bank violated this provision by filing suit without first either obtaining (Continued)

**II.   Analysis.**

   *A.   Legal Standard.*

PNC Bank's Motion for Appointment of Receiver presents a question of federal law. Indeed, it is well settled that, in a diversity action pending in federal district court, federal law governs requests for appointment of receivers. *National Partnership Inv. Corp. v. National Housing Development Corp.*, 153 F.3d 1289, 1291-92 (11th Cir. 1998) ("We therefore hold that federal law governs the appointment of a receiver by a federal court exercising diversity jurisdiction."); *see also Canada Life Assur. Co. v. LaPeter*, 563 F.3d 837, 843 (9th Cir. 2009) ("we join the Eleventh and Eighth Circuits in holding that federal law governs the issue of whether to appoint a receiver in a diversity action"); *Waag v. Hamm*, 10 F. Supp.2d 1191, 1193 (D. Colo. 1998) ("Whether a federal court should appoint a receiver in a diversity action presents a question resolved by federal law."). As such, the Court looks to Rule 66 of the Federal Rules of Civil Procedure, which provides as follows: "These rules govern an action in which the appointment of a receiver is sought …. But the practice in administering an estate by a receiver … must accord with the historical practice in federal courts or with a local rule." Rule 66, Fed.R.Civ.P. A substantial body of federal case authorities is helpful in fleshing out the "historical practice" that governs PNC Bank's Motion.

The Eleventh Circuit has opined that "[a] district court's appointment of a receiver … is an extraordinary equitable remedy." *United States v. Bradley*, 644 F.3d 1213, 1310 (11th Cir.

---

Infirmary Health's consent or submitting the matter to arbitration. (Infirmary Health also alleges as violations PNC Bank's recent unilateral seizure of certain accounts and funds of Presbyterian in which Infirmary Health possessed an interest.) Because of these alleged violations, Infirmary Health contends that PNC Bank is precluded from enforcing other aspects of the Intercreditor Agreement (including most notably § 3(b), which provides that "the security interests in and Liens of each of the Mortgagees on the Collateral under the Mortgages are neither superior nor inferior, but equal" to each other), and that Infirmary Health thereby ranks as senior creditor. For its part, PNC Bank counters that its activities did not violate the Intercreditor Agreement, citing a portion of the arbitration clause reading as follows: "Neither anything contained in this Section nor the exercise of any right to arbitrate shall limit the right of any party to … obtain provisional or ancillary remedies such as … appointment of a receiver from a court having jurisdiction, before, during or after the pendency of any arbitration proceeding." (*Id.*, § 22(c).) Infirmary Health has not addressed this argument directly in its filings on the Motion for Appointment of Receiver.

2011) (citation and internal quotation marks omitted).[7]  "[T]he appointment of a receiver in equity is not a substantive right; rather, it is an ancillary remedy which does not affect the ultimate outcome of the action." *National Partnership*, 153 F.3d at 1291; *see also Hutchinson v. Fidelity Inv. Asss'n*, 106 F.2d 431, 436 (4th Cir. 1938) ("It should not be forgotten that the appointment of a receiver is not a matter of right, but one resting in the sound discretion of the court.") (citation omitted); *Sterling Sav. Bank v. Citadel Development Co.*, 656 F. Supp.2d 1248, 1258 (D. Or. 2009) (noting that "a party does not have a substantive right to a receiver"). In short, "[r]eceivership is an extraordinary remedy that should be employed with the utmost caution and is justified only where there is a clear necessity to protect a party's interest in property, legal and less drastic equitable remedies are inadequate, and the benefits of receivership outweigh the burdens on the affected parties." *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012).[8]  These principles are part and parcel of the "historical practice" guiding the pertinent Rule 66 analysis.

### B. *Impact of Contractual Consent.*

As an initial matter, PNC Bank argues that it is entitled to appointment of a receiver as a matter of contract law, inasmuch as Presbyterian consented in the December 2005 Mortgage to the appointment of a receiver "with power to lease and control the Collateral and with such other powers as may be deemed necessary in the event of a default." (Doc. 2, Exh. A at Exh. 20, § 8.03.) PNC Bank frames its argument in straightforward terms. In particular, PNC Bank posits that because Presbyterian is in default under the bond documents and PNC Bank has initiated

---

[7] *See also Canada Life*, 563 F.3d at 844 ("Under federal law, appointing a receiver is an extraordinary equitable remedy, which should be applied with caution.") (citations and internal quotation marks omitted); *First United Bank & Trust v. Square at Falling Run, LLC*, 2011 WL 1563108, *8 (N.D. W.Va. Mar. 31, 2011) ("A district court's authority to appoint a receiver derives from its inherent equitable powers under the common law.").

[8] *See also Skirvin v. Mesta*, 141 F.2d 668, 673 (10th Cir. 1944) ("[T]he power to appoint a receiver with authority to take custody and control of property and operate it as a going concern is a delicate one which is jealously safeguarded, and it should be exerted sparingly. A court should be cautious and circumspect in the exertion of the remedy because perversion or abuse may work great hardship."); *Varsames v. Palazzolo*, 96 F. Supp.2d 361, 365 (S.D.N.Y. 2000) ("The appointment of a receiver is considered an extraordinary remedy and should be utilized only where clearly necessary to protect an interest by the plaintiff in property where the rights over that property are in dispute.").

foreclosure proceedings, under § 8.03 of the Mortgage, "PNC Bank is contractually entitled as a matter of right to the appointment of a receiver," without regard to equitable considerations. (Doc. 4, at 3-6.) The principal authority on which PNC Bank relies for this proposition is a 2008 unpublished slip opinion from this District Court.

The Court disagrees that the question of receivership appointment in this case may be resolved solely by reference to contractual provisions and contract law. Two independent considerations inform this conclusion. First, notwithstanding PNC Bank's reliance on the 2008 slip opinion, persuasive federal case law has determined that contractual consent is merely one non-dispositive factor in the overarching equitable inquiry under Rule 66. PNC Bank presupposes that it has a positive right to receivership; however, it does not, and cannot. Again, appointment of a receiver is an inherently equitable remedy committed to the trial court's discretion. *See, e.g., Waag*, 10 F. Supp.2d at 1193 ("receivership is not a positive right," but "is an extraordinary equitable inquiry"); *Midwest Sav. Ass'n v. Riversbend Associates Partnership*, 724 F. Supp. 661, 662 (D. Minn. 1989) ("the appointment of a receiver is not a matter of positive right but rather lies in the discretion of the court"). The fundamental character of this remedy is thus incompatible with PNC Bank's claim of absolute entitlement to same.

Stated differently, the discretionary, equitable nature of the receivership remedy, as memorialized by the historical practice in federal courts, would be destroyed if a plaintiff could lock in a positive legal right to appointment of a receiver through inclusion of ironclad consent language in the underlying security instrument.[9] This Court therefore hews to the body of precedents opining that the equitable, discretionary nature of the Rule 66 inquiry is not supplanted by a non-discretionary, mechanical contract enforcement approach where the mortgagor has previously consented to appointment of a receiver in the event of default. *See,*

---

[9] As discussed *supra*, federal courts have emphasized that "the district court has broad discretion in appointing a receiver, that it may consider a host of relevant factors, and that no one factor is dispositive." *Canada Life*, 563 F.3d at 845; *see also Sterling*, 656 F. Supp.2d at 1258 ("that a receiver is not a matter of right or entitlement is demonstrated by the well-settled principle that the court has broad discretion in deciding whether to appoint a receiver"). To accept PNC Bank's reasoning would be to cast aside this entire line of authorities, transforming the receivership issue into one of positive right, divorced from equitable considerations, as long as the mortgage documents recited the mortgagor's advance consent to receivership in the event of default.

*e.g., Sterling*, 656 F. Supp.2d at 1261 (collecting authorities and concluding that contractual consent is not automatically dispositive of federal receivership analysis, but that equitable factors still must be considered); *see also D.B. Zwirn Special Opportunities Fund, L.P. v. Tama Broadcasting, Inc.*, 550 F. Supp.2d 481, 491 (S.D.N.Y. 2008) ("courts retain the discretion to deny appointment of a receiver under appropriate circumstances even though the mortgage provides the mortgagee a specific right to an appointment") (citation and internal quotation marks omitted); *F.D.I.C. v. Vernon Real Estate Investments, Ltd.*, 798 F. Supp. 1009, 1012 (S.D.N.Y. 1992) ("the court has the discretion to deny appointment of a receiver under the appropriate circumstances even though the mortgage provides the mortgagee a specific right to an appointment"); *Gage v. First Federal Sav. & Loan Ass'n of Hutchinson, Kan.*, 717 F. Supp. 745, 750 (D. Kan. 1989) ("Appointment of a receiver is not automatic because of a clause in the mortgage agreement," but is "normally limited to situations where fraud, waste, or irreparable injury are occurring.") (citations omitted); *LPP Mortgage Ltd. v. Ondyn Herschelle*, 2014 WL 3568577, *3 (N.D. Cal. July 17, 2014) ("even if the Deed of Trust can be read as conferring Defendant's consent to appointment of a receiver, such consent is not dispositive under federal law," although it is a factor that "weighs in Plaintiff's favor"); *California Bank & Trust v. Shilo Inn*, 2012 WL 1883474, *5 (D. Idaho May 22, 2012) (contractual consent to appointment of receiver is considered as one factor, weighed in addition to other equitable factors in federal receivership calculus). Accordingly, the existence of the § 8.03 consent provision in the Mortgage is properly viewed as no more than a non-dispositive factor in the equitable analysis, albeit one that should be afforded substantial weight.

Second, a separate and independent infirmity in PNC Bank's stance that a receiver must be appointed as a matter of contract right is that it overlooks and marginalizes the interests of intervenor defendant Infirmary Health. As discussed *supra*, Infirmary Health is a secured creditor whose legal interest in Westminster Village is at least coextensive with (and perhaps superior to) that of PNC Bank. Certainly, there is no indication that Infirmary Health ever consented to the appointment of a receiver at Westminster Village. Nor does the Court perceive any persuasive argument that Infirmary Health's interests may be disregarded or discounted in deciding the Motion to Appoint Receiver, simply because Presbyterian consented to a receiver pursuant to § 8.03 of the December 2005 Mortgage. Even if that contract clause eliminated equitable considerations from Presbyterian's standpoint (which the Court has already concluded

it does not), a full analysis of the equities would remain appropriate to ensure adequate protection and consideration of the interests of the "other" secured creditor. Again, Infirmary Health opposes the appointment of a receiver and insists that the collateral will be harmed (not preserved) if such action is taken. Any contract right that PNC Bank might have to appointment of a receiver vis a vis Presbyterian is not binding on interested party Infirmary Health, and therefore cannot supplant application of a traditional equitable analysis to resolve the Motion pursuant to Rule 66.

For the foregoing reasons, the Court concludes that Presbyterian's contractual consent to appointment of a receiver pursuant to § 8.03 of the December 2005 Mortgage is not dispositive of the Motion under Rule 66. Accordingly, the next step is to weigh the equitable receivership factors identified by federal courts, to determine whether the Court should exercise its discretion in favor of granting the extraordinary remedy of appointment of a receiver. For purposes of that analysis, Presbyterian's contractual consent to a receiver will be deemed a factor entitled to substantial weight, although its force is mitigated somewhat by Infirmary Health's non-consent to appointment of a receiver. *See generally Sterling*, 656 F. Supp.2d at 1260 ("Consent by the parties in a deed of trust is a factor that commands great weight, but it is not dispositive.").

### C. *Equitable Considerations.*

#### 1. *Factors that May Be Considered.*

As discussed *supra*, the determination of whether to appoint a receiver is an equitable matter committed to the trial court's sound discretion. There is no rote "checklist" of mandatory factors or criteria to be applied;[10] rather, federal courts weigh all relevant considerations. A non-exhaustive recital of potentially pertinent criteria includes the following: (i) "whether [the party] seeking the appointment has a valid claim;" (ii) "whether there is fraudulent conduct or the probability of fraudulent conduct" by the defendant; (iii) "whether the property is in imminent danger of being lost, concealed, injured, diminished in value, or squandered;" (iv) "whether legal remedies are inadequate;" (v) the balance of harms as between the party seeking appointment of a receiver and those opposing it; (vi) "the plaintiff's probable success in the action and the possibility of irreparable injury to plaintiff's interest in the property;" and (vii) "whether [the]

---

[10] *See, e.g., Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314 (8th Cir. 1993) ("there is no precise formula for determining when a receiver may be appointed").

plaintiff's interests sought to be protected will in fact be well-served by receivership." *Canada Life*, 563 F.3d at 844 (citations and internal quotation marks omitted).[11]

### 2. *Quality of Resident Care / Mismanagement of Facility.*

In seeking appointment of a receiver, PNC Bank leans on a number of these factors, including assertions that Westminster Village is diminishing in value, that its legal remedies are inadequate, that the harm to PNC Bank caused by denial of appointment of a receiver would exceed the harm to Presbyterian if a receiver were installed, that PNC Bank is likely to succeed on the merits, and that the public interest favors appointment of a receiver. (Doc. 4, at 8-16.) The overriding common theme connecting these threads is PNC Bank's position that Westminster Village is being mismanaged, as a result of which its residents are receiving inadequate care and the facility could topple into chaos at any moment.[12] Because PNC Bank

---

[11] *See also PNC Bank, Nat'l Ass'n v. Goyette Mechanical Co.*, --- F. Supp.2d ----, 2014 WL 1674079, *3 (E.D. Mich. Apr. 25, 2014) ("District courts have considered a number of factors when determining whether to exercise their discretion to appoint a receiver, including (1) the adequacy of the security; (2) the financial position of the borrower; (3) any fraudulent conduct on the defendant's part; (4) imminent danger of the property being lost, concealed, injured, diminished in value, or squandered; (5) inadequacy of legal remedies; (6) the probability that harm to the plaintiff by denial of appointment would outweigh injury to parties opposing appointment; (7) the plaintiff's probable success in the action and the possibility of irreparable injury to the plaintiff's interest in the property; and (8) whether the plaintiff's interests sought to be protected will in fact be well-served by a receivership."); *Sterling*, 656 F. Supp.2d at 1259 ("[a]lthough historical practice has not yielded a precise formula for the appointment of a receiver, court decisions have created a group of factors that a court should consider"); *Varsames*, 96 F. Supp.2d at 365 ("The following factors are considered relevant to establishing the need for a receivership: [F]raudulent conduct on the part of defendant; the imminent danger of the property being lost, concealed, injured, diminished in value, or squandered; the inadequacy of the available legal remedies; the probability that harm to plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment; and, in more general terms, plaintiff's probable success in the action and the possibility of irreparable injury to his interests in the property.") (citation omitted); *Waag*, 10 F. Supp.2d at 1193 ("Factors typically influencing the district court's exercise of discretion include: (1) the existence of a valid claim by the moving party; (2) the probability that fraudulent conduct has occurred or will occur to frustrate the claim; (3) imminent danger that property will be lost, concealed, or diminished in value; (4) inadequacy of available legal remedies; (5) lack of a less drastic equitable remedy; and (6) the likelihood that appointment of a receiver will do more harm than good.").

[12] Such assertions are liberally sprinkled across PNC Bank's filings. Plaintiff states that "the quality and standards of [Westminster Village] are less than acceptable." (Doc. 3, at 3.) It alleges that "the Property has been mismanaged, resulting in injury to and waste of the
(Continued)

-10-

has couched its Motion for Appointment of Receiver as necessary to correct deficiencies in resident care at Westminster Village, the Court looks behind the rhetoric and examines the record facts concerning the present state of affairs at that facility.

The evidentiary centerpiece of PNC Bank's attacks on Westminster Village's quality of care is a nursing home inspection performed by the federal Department of Health and Human Services, Centers for Medicare & Medicaid Services ("CMS"), on October 23, 2013. (*See* North Aff. (doc. 3, Exh. B), ¶ 27.)[13] For whatever reason, no party has included these inspection results as part of the court file, instead referring the Court to an Internet hyperlink (www.medicare.gov/nursinghomecompare/search/html) with instructions to search for Westminster Village. The Court has done so. That website reflects that, in this 2013 inspection, CMS gave Westminster Village an overall rating of 2 stars out of 5, which equates to "below average." This singular fact lies at the core of PNC Bank's contention that Presbyterian is mismanaging Westminster Village and providing substandard care, such that appointment of a receiver is necessary to preserve the collateral and protect the public interest.

Closer examination of the CMS results reveals a far more nuanced evaluation of Westminster Village's operations than PNC Bank admits. The CMS inspection yielded no findings that Westminster Village was endangering residents or that there were widespread, flagrant deficiencies or instances of gross mismanagement. On the metric of "Quality Measures"

---

Property." (*Id.* at 15.) PNC Bank further asserts that "many of the independent living cottages are uninhabitable because [Presbyterian] has not properly maintained them." (Doc. 4, at 10.) Elsewhere, PNC Bank writes that "the standards of [Westminster Village] are deteriorating" and opines that "[t]his does not bode well for the health care services that are being provided." (*Id.* at 9.) Plaintiff cites what it calls Presbyterian's "inability to meet certain standards in the provision of health care services to its residents and patients." (*Id.* at 12.) More pointedly, PNC Bank alleges that "the quality of care received by the patients [at Westminster Village] is substandard" and "unacceptable." (Doc. 30, at 12, 13.) In sum, plaintiff's view is that Westminster Village "is not doing a good job of providing healthcare." (Doc. 31, at 2.)

[13] By all appearances, this CMS inspection was confined to the nursing home component, without purporting to inspect, examine or rate other aspects of Westminster Village's campus, such as its 260 independent living units, its amenities and common facilities, or other features of that facility beyond the nursing home. As such, the limitations in extrapolating from this data to a global pronouncement about quality levels applicable to Westminster Village at-large are self-evident.

(designed to "show how well the nursing home cares for residents' needs"), CMS rated Westminster Village 3 stars, or "average." With regard to the health inspection, the only deficiencies identified by CMS were rated as conditions causing "minimal harm or potential for actual harm" to residents, and CMS deemed all such deficiencies to have been corrected on November 27, 2013 or December 3, 2013 (*i.e.*, nearly one year ago). As for staffing levels, while Westminster Village was rated "below average" in this category, CMS rated it 3 stars, or "average," with respect to RN staffing. The CMS report also confirmed that Westminster Village has received no fines or payment denials during the last three years.

To be sure, PNC Bank cherry-picks certain facts from the CMS report that it uses to support a conclusion that Westminster Village "is operating at below-Alabama and –national averages." (Doc. 30, at 11.) Such an argument only tells half of the story. The same CMS tables on which PNC Bank relies also contain line items in which Westminster Village was found to be performing at a level exceeding Alabama and national averages.[14] More broadly, the CMS inspection is of limited utility in assessing present operations at Westminster Village because it is stale, dating back more than a year. There is substantial record evidence that Westminster Village is performing at a higher level today than was reported by CMS in October 2013. For example, with regard to staffing levels, Presbyterian rebuts PNC Bank's showing of "below average" performance in October 2013 with evidence that "[s]taffing levels verified by State surveyors on September 30, 2014 through October 2, 2014 qualify for a five-star CMS rating." (Rouse Decl. (doc. 18, Exh. A), ¶ 26.) Presbyterian further shows that this recent State survey yielded just two minor citations in the nursing home and one minor citation in the kitchen. (*Id.*) Additionally, Presbyterian "reported zero acquired bed sores, which is a key indicator of adequate patient care, in the most recent quarter." (*Id.*)[15]

---

[14] For example, the CMS inspection report documents that Westminster Village short-stay residents self-reported moderate to severe pain at a substantially <u>lower</u> level than the Alabama and national averages, and that a substantially <u>higher</u> percentage of Westminster Village short-stay residents were assessed and given, appropriately, seasonal influenza vaccine than the Alabama and national averages. Accordingly, PNC Bank's opportunistic reliance on the "quality measures" data that supports its position, coupled with omission of "quality measures" data that undercuts it, conveys a misleading impression.

[15] Presbyterian's evidence also reflects proactive efforts to maximize and improve resident care. Specifically, it hired a retirement home consultant, Continuum Development
(Continued)

In short, PNC Bank's reliance on the October 2013 CMS inspection report to anchor its position that Presbyterian is providing "substandard," "unacceptable," or "deteriorating" patient care at Westminster Village is misplaced. The CMS report does not state that Westminster Village is being operated in an unacceptable manner in absolute terms. Its assessment of Westminster Village's performance is mixed, to be sure, but the identified deficiencies appear to have been minor and to have been corrected by Presbyterian promptly after the inspection. CMS rated Westminster Village's quality of care as "average," which cannot be reconciled with PNC Bank's unflattering rhetoric and dire forecasts of inability to attend to resident needs. Moreover, the CMS report is more than a year old, and evidence of a more recent vintage suggests that Westminster Village is performing at a substantially higher level than that reported by CMS in October 2013. For all of these reasons, the Court is not convinced by the CMS report that appointment of a receiver at Westminster Village is necessary to remedy operational mismanagement and protect residents from substandard care.[16]

Nor is PNC Bank's position strengthened by its statement that "many of the independent living cottages are uninhabitable because [Presbyterian] has not properly maintained them." (Doc. 4, at 10.) The record simply does not support such an assertion. PNC Bank cites vague hearsay testimony of what a Presbyterian representative may have informed a PNC Bank representative at some unidentified time. (North Aff., ¶ 6.) But plaintiff's unrebutted evidence is that Presbyterian has just "four unoccupied independent living units (out of 258 total) for

---

Services, Inc. ("CDS"), to review Westminster Village's operations, and reports that "CDS's review was complimentary of operations at Westminster Village." (Rouse Decl., ¶ 29.) CDS made certain recommendations, the vast majority of which Presybterian is presently implementing. (*Id.*)

[16]  Additionally, it bears noting that Westminster Village is subject to considerable federal and state regulatory oversight, inasmuch as it holds various licenses, certifications, permits and accreditations. (Rouse Decl., ¶¶ 24-25.) The undisputed evidence before the Court is that no regulatory agency with responsibility over Westminster Village has commenced action against that facility, or has threatened or proposed denial or withdrawal of Presbyterian's licenses, certifications, permits and accreditations. (*Id.*) Logic and common sense dictate that these agencies would not stand idly by if, as PNC Bank posits, Westminster Village "obviously is not doing a good job of providing healthcare" (doc. 31, at 2), or if resident safety and health were in jeopardy because of Presbyterian's mismanagement or ineptitude.

which renovations are not planned until the units are marketed." (Rouse Decl., ¶ 27.)[17] This evidence of a modest need for repairs in a tiny percentage of the facility's independent living units does not demonstrate that Westminster Village suffers from dissipation and waste because of Presbyterian's failure and inability to perform important maintenance of physical dwelling units. Stated differently, the need for "noncritical renovations" in four independent living units at Westminster Village cannot reasonably be viewed as grounds supporting immediate appointment of a receiver to preserve the value of the collateral and insulate it from waste.

PNC Bank's final criticism of Westminster Village's day-to-day operations is a somewhat nebulous suggestion that Presbyterian is on the verge of running out of cash and that the facility may be forced to shut down at any moment for lack of funds.[18] On this point, PNC Bank outlines a nightmare scenario, predicated on the notion that Presbyterian "is not paying its bills at present" and that "at some point [Presbyterian] will fail, which will be catastrophic to its resident population, both from a health and financial standpoint." (Doc. 31, at 3.) PNC Bank urges the immediate appointment of a receiver to avert such a "catastrophe."

The problem with this scenario is that there is no evidence that Presybterian is unable to pay its routine operating bills at this time, or that it lacks sufficient cash flow to cover basic operational costs of Westminster Village. Indeed, the only record evidence on this point is to the contrary. Presbyterian's Executive Director, Robert L. Rouse, Jr., has signed a declaration in which he attests that Presbyterian "has sufficient cash flow to pay current operating expenses and make regular principal and interest payments on its debt." (Rouse Decl., ¶ 27.) The financial picture painted by Presbyterian stands in stark contrast to PNC Bank's characterization that it is financially unstable and unable to pay its bills. According to Presbyterian's evidence, its cash flow is adequate to cover current operational expenses and to make regular debt service

---

[17] Presbyterian explains that it "has made a business judgment to devote resources to resident and patient care as opposed to remodeling independent living units unnecessarily in advance of their likely re-occupancy." (Rouse Decl., ¶ 27.) This reasonable business decision cannot lend credence to PNC Bank's theory of mismanagement.

[18] PNC Bank ties this allegation into its claims of unacceptable resident care by asserting that Presbyterian "does not have the financial wherewithal to improve such conditions and is running out of cash." (Doc. 4, at 2.) Similarly, PNC Bank posits that, unless a receiver is appointed, Presbyterian's "financial inability to fulfill its responsibilities will continue to negatively impact the viability and value of the Property." (Doc. 3, at 15.)

payments, suggesting that this situation is in fact sustainable in the short and medium term (pending any foreclosure or other sale of the property).[19] As further proof of its relative financial health, Presbyterian shows that its occupancy levels are "comparatively high" (84% of independent living units, 93% of assisted living units and nursing beds), with some 33 reservation agreements for occupancy of independent living units entered into in 2014 alone. (Rouse Decl., ¶ 28.)[20]

Considered in the aggregate, this collection of arguments by PNC Bank boils down to alarmist rhetoric that Westminster Village is not being properly maintained, its residents are not being properly cared for, and the entire facility is on the verge of collapse. Were there facts to support these claims, the Court would be sympathetic of PNC Bank's demands for appointment of a receiver to preserve and improve the collateral, to safeguard resident health, and to protect the property's value.[21] To date, however, those supporting facts have not materialized.

---

[19] To be sure, Presbyterian acknowledges its inability to make the balloon payments it owes to PNC Bank and Infirmary Health. (Rouse Decl., ¶ 16.) Those financial obligations can and must be addressed; however, they do not imply such instability in Presbyterian's day-to-day financial operations that this entity is teetering on the brink of insolvency and unable to pay routine bills. As Infirmary Health points out, Presbyterian's "financial problems … have existed for many months while [the parties] have engaged in workout discussions" (doc. 23, at 20), yet the facility has remained open and operational. All indications, then, are that Presbyterian's financial position, while certainly suboptimal, is sustainable for the immediate future, such that it appears capable of continuing to operate Westminster Village until such time as the secured creditors exercise remedies on the collateral to obtain repayment of Presbyterian's outstanding debt obligations.

[20] All of these facts translate into encouraging revenue prospects for Westminster Village, inasmuch as high occupancy is the key to receiving new entrance fees and ongoing payment of monthly service fees, surcharges and licensed area care fees on which Presbyterian depends. (Rouse Decl., ¶¶ 9-10.)

[21] After all, "[t]he primary consideration in determining whether to appoint a receiver is the necessity to protect, conserve and administer property pending final disposition of a suit." *First United Bank*, 2011 WL 1563108, at *9 (citations omitted); *see also Manufacturers and Traders Trust Co. v. Minuteman Spill Response, Inc.*, 999 F. Supp.2d 805, 818 (W.D. Pa. 2013) (to be eligible for appointment of a receiver, "a plaintiff must make a clear showing that (1) an emergency exists and (2) that a receiver is necessary to protect the property interests of the plaintiff"); *U.S. Bank Nat'l Ass'n v. Nesbitt Bellevue Property LLC*, 866 F. Supp.2d 247, 255 (S.D.N.Y. 2012) ("receivership is traditionally used to protect the value of an asset that is the subject of litigation") (citation and internal quotation marks omitted).

Plaintiff's unrebutted evidence is that Presbyterian is providing adequate care to Westminster Village residents, that it has sufficient cash flow to meet regular operational expenses, that Westminster Village occupancy is relatively high, and that new residency agreements are outpacing historical benchmarks. These facts cannot be reconciled with PNC Bank's position that Presbyterian is "limping along" and providing "unacceptable" care, with "catastrophic" failure in the offing unless a receivership is imposed.[22]

### 3. *Other Equitable Considerations.*

As stated, federal courts consider many factors in determining whether to exercise their discretion in favor of the equitable remedy of appointing a receiver. Among those factors "typically warranting appointment are a valid claim by the party seeking the appointment; the probability that fraudulent conduct has occurred or will occur to frustrate that claim; imminent danger that property will be concealed, lost, or diminished in value; inadequacy of legal remedies; lack of a less drastic equitable remedy; and likelihood that appointing the receiver will do more good than harm." *Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316-17 (8th Cir. 1993). Additionally, the Court considers Presbyterian's contractual consent to appointment of a receiver in the December 2005 Mortgage as a factor favoring the relief sought in PNC Bank's Motion. *See, e.g., Sterling*, 656 F. Supp.2d at 1261 ("[t]he consent provision in the Deed of Trust is one of these 'other circumstances,' and the court will consider it in addition to weighing the federal receivership factors").

Many of these traditional equitable considerations do not point in the direction of receivership in this case. Although PNC Bank has a facially valid claim by virtue of its security interest and Presbyterian's default, that claim is rendered less certain by limitations imposed by the Intercreditor Agreement executed by PNC Bank and Infirmary Health.[23] There is neither

---

[22] Of course, the Court recognizes that PNC Bank is at a disadvantage because it has not had the benefit of discovery to explore Westminster Village's present operational and financial status. As plaintiff and movant, however, PNC Bank bears the burden of proving that appointment of a receiver is warranted. Unflattering buzzwords and prognostications of Westminster Village's inevitable and impending demise are simply insufficient to carry that burden, particularly when Presbyterian has countered with affirmative evidence of economic, operational, and caregiving viability.

[23] Now is not the time or the place to delve into the minutiae of the parties' disagreement over the interpretation and effect of the Intercreditor Agreement. In brief, (Continued)

-16-

evidence nor even accusation of fraudulent conduct by Presbyterian.  As already discussed in detail *supra*, plaintiff has not shown imminent danger that Westminster Village will be concealed, lost or diminished in value unless a receiver is appointed.  In the absence of evidence of dissipation, waste, or diminution in value, there is no reason to think that PNC Bank's legal remedies vis a vis the collateral will be inadequate or will be compromised without a receivership.  On the other hand, there appears to be a substantial risk that appointment of a receiver might do more harm than good for the value of the collateral and the preservation of Presbyterian assets that may be used to pay off secured creditors.[24]

---

Infirmary Health asserts that PNC Bank's unilateral filing of this lawsuit, seizure of certain Presbyterian funds and accounts, noticing of foreclosure sale, and moving for receiver without Infirmary Health's consent or arbitration to resolve their differences violates the Agreement, and voids PNC Bank's contractual right to co-equal status of its debt, such that Infirmary Health has priority as senior creditor.  For its part, PNC Bank insists that Section 22 of the Intercreditor Agreement authorized the challenged conduct and that it did not violate anything.  For purposes of this Order, it suffices to point out that the Intercreditor Agreement renders PNC Bank's claims for receivership and foreclosure of Westminster Village murkier than they would otherwise be, such that it is not a slam dunk that PNC Bank will ultimately be entitled to prevail as to those particular remedies (or to be first in line for repayment from the proceeds of any foreclosure sale that may occur).  Those and other merits questions will await resolution at a later date upon a developed record and more focused briefing.

[24] Elaboration on this last point may be helpful.  As Presbyterian and Infirmary Health persuasively argue, the disadvantages to appointment of a receiver in this case are many.  For example, receivership will be expensive, as PNC Bank contemplates appointment of two layers of receivers/consultants, each being compensated at rates of up to $400/hour and reimbursed for all travel expenses (including for the receiver based in Pennsylvania).  (*See* doc. 3, ¶¶ 41-52; Hepler Aff. (doc. 3, Exh. C), ¶ 12; Warren Aff. (doc. 3, Exh. F), ¶ 6.)  These expenses would be paid out of receivership assets and therefore diminish available resources to pay secured creditors.  More importantly, receivership may be damaging to the Westminster Village brand, creating a stigma that may discourage prospective residents and/or ignite a mass departure of existing residents, injecting uncertainty into the facility's operations, guaranteeing that multiple changes of control will occur in quick succession (one with the receivership, the other with the foreclosure sale), and potentially alienating, distracting or discouraging employees. (*See* doc. 18, at 21-24; doc. 23, at 21-22.)  Given these likely negative effects, coupled with the likelihood of only minimal countervailing positive effects (because the facility does not appear to be imperiled by mismanagement or waste), the Court perceives a considerable risk that appointment of a receiver in these circumstances will accomplish more harm than good with respect to the value of the collateral and preservation of assets to satisfy Presbyterian's indebtedness to PNC Bank and Infirmary Health.

## III. Conclusion.

Federal courts have routinely observed that "[a] receiver is an extraordinary equitable remedy that is only justified in extreme situations." *Aviation Supply*, 999 F.2d at 316.[25] It is not a remedy to be granted lightly, based on speculation or surmise. It is not a remedy to be granted as a matter of contractual right, but is instead committed to the trial court's discretion based on all relevant equitable factors. In this case, those considerations include the following: PNC Bank has come forward with no evidence showing imminent threat that Westminster Village will be lost, dissipated, or diminished in value. No showing has been made of mismanagement, fraud, impending financial collapse, or unsatisfactory care. Despite Presbyterian's advance written consent to appointment of a receiver, PNC Bank's request is complicated by the non-consent of co-equal (or, perhaps, senior) secured creditor Infirmary Health and by an Intercreditor Agreement purportedly curtailing its ability to resort unilaterally to remedies such as these. Moreover, under the circumstances presented here, there is a real risk that receivership may do more harm than good because of (i) the costs of the proposed receiver / consultant team, and the concomitant burden on receivership assets; (ii) the stigma and uncertainty that would attach to Westminster Village in a receivership scenario; and (iii) the possibility that appointment of a receiver may destabilize and diminish the value of Westminster Village, and hamper its ability to retain and attract both residents and employees.

For all of the foregoing reasons, based on the arguments and record facts presented by the parties to date, the Court exercises its discretion not to impose the extraordinary equitable remedy of appointing a receiver at this time. Accordingly, plaintiff's Motion for Appointment of Receiver (doc. 3) is **denied**.

DONE and ORDERED this 13th day of November, 2014.

> s/ WILLIAM H. STEELE
> CHIEF UNITED STATES DISTRICT JUDGE

---

[25] "When the moving party seeks a receiver who will not only collect rents and profits, but will also manage and operate the mortgaged property pending foreclosure, federal courts are particularly cautious in appointing a receiver, and therefore consider whether the evidence demonstrates something more than just the doubtful financial standing of the defendant and the inadequacy of the security." *Wells Fargo Bank, N.A. v. CCC Atlantic, LLC*, 905 F. Supp.2d 604, 615 (D.N.J. 2012) (citations and internal quotation marks omitted).