IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| PNC BANK, N.A., | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )   CIVIL ACTION 14-0461-WS-B |
| | ) |
| PRESBYTERIAN RETIREMENT | ) |
| CORPORATION, INC., *et al.*, | ) |
| | ) |
|     Defendants. | ) |

**ORDER**

This matter comes before the Court on plaintiff's Motion to Compel Arbitration (doc. 56). The Motion has been extensively briefed, with both participating defendants having filed objections (docs. 58 & 61) and movant having submitted replies (docs. 63 & 64) to each.[1]

**I.  Background.**

    *A.    Nature of the Lawsuit / Causes of Action.*

Plaintiff, PNC Bank, N.A., commenced this action against defendants Presbyterian Retirement Corporation, Inc. ("Presbyterian") and The Special Care Facilities Financing Authority of the City of Daphne (the "Authority") back on October 2, 2014.[2] Defendant Infirmary Health System, Inc. ("Infirmary Health") was granted leave to intervene via Order (doc. 33) entered on November 4, 2014. At its core, this litigation is about Presbyterian's default

---

[1] In light of the issuance of this Order, plaintiff's Motion to Stay Deadlines (doc. 65) is **moot**.

[2] To date, the Authority has neither appeared nor defended in this action, even though service of process was purportedly perfected on October 10, 2014. (*See* doc. 25.) Notwithstanding the Authority's failure to appear, PNC Bank has not applied for clerk's entry of default, perhaps because of plaintiff's explanation in the pleadings that "[t]he Authority is named as a defendant primarily to make sure that PNC Bank can obtain the complete relief it seeks herein," in that the Authority is a joint mortgagor for the subject real estate collateral. (Doc. 1, ¶ 3.)

of debt-service obligations owed to PNC Bank. Those obligations were secured by Westminster Village, a not-for-profit retirement community owned and operated by Presbyterian. PNC Bank now asserts various claims against Presbyterian rooted in breach of contract. In those claims, PNC Bank pursues monetary and equitable remedies arising from the alleged default, including money damages in excess of $8.2 million and appointment of a receiver to manage and control Westminster Village in anticipation of a proposed foreclosure sale. Infirmary Health is an interested stakeholder because it is also a creditor of Presbyterian and a mortgagee as to Westminster Village. The rub is that PNC Bank and Infirmary Health appear to have drastically different ideas as to the disposition of that collateral.

Both defendants have asserted counterclaims against PNC Bank. For its part, Presbyterian filed a Counterclaim (doc. 32) on October 31, 2014, through which it interposed claims sounding in conversion, money had and received, negligence, and wantonness, based on allegations that PNC Bank had wrongfully seized over $900,000 from Presbyterian accounts that could not properly be used to satisfy the defaulted debt because they contained funds that donors had restricted to specific purposes. Infirmary Health filed a Counterclaim (doc. 12) that took effect on November 4, 2014, asserting that PNC Bank had violated an Intercreditor Agreement that PNC Bank's predecessor and Infirmary Health executed in December 2005 to clarify their respective rights and duties with respect to Westminster Village and various related assets in which they each hold interests. Infirmary Health seeks a declaratory judgment that PNC Bank cannot enforce the Intercreditor Agreement against it and that Infirmary Health's mortgage is senior in priority to that of PNC Bank, as well as a money judgment for PNC Bank's alleged breaches of the Intercreditor Agreement.

### B. Litigation Activity.

The nature, extent and progress of these legal proceedings are relevant to consideration of the pending Motion to Compel Arbitration. More than six months have passed since PNC Bank commenced this litigation. Contemporaneously with filing the Complaint, PNC Bank requested immediate appointment of a receiver for Westminster Village on an expedited basis. (Docs. 3 & 5.) The Court entered an Order (doc. 9) on October 7, 2014 denying expedited treatment of the motion for appointment of receiver, given PNC Bank's failure to show that Westminster Village was likely to suffer catastrophic harm absent immediate resolution of the receivership question, and PNC Bank's longstanding awareness of the circumstances giving rise to the alleged need for

urgent equitable relief.  The motion for appointment of receiver was then briefed in full, after which the Court entered an Order (doc. 35) denying PNC Bank's motion.  In so doing, the Court reasoned as follows: (i) PNC Bank was not entitled to the extraordinary equitable remedy of appointment of a receiver as a matter of contractual right; (ii) PNC Bank's factual allegations (*i.e.*, that Westminster Village was being grossly mismanaged, operating in a manner that compromised resident care, and teetering on the brink of financial collapse) were largely unsupported by record facts; and (iii) equitable considerations such as the adequacy of less drastic remedies and the likelihood that a receiver may do more harm than good weighed against granting the requested relief.

In the wake of denial of the motion for appointment of receiver, this action proceeded for several months along a normal federal civil litigation track.  A motion for preliminary injunction filed by Infirmary Health to block a contemplated March 2015 foreclosure sale of Westminster Village was amicably resolved by consent of the parties.  (*See* doc. 55.)  The parties submitted their Rule 26(f) Report (doc. 43) on December 29, 2014, after which Magistrate Judge Bivins entered a comprehensive Rule 16(b) Scheduling Order (doc. 46).  That Scheduling Order fixed a discovery cutoff date of July 1, 2015, and set this matter for jury trial during November 2015.

On January 29, 2015, and apparently prior to any discovery having been taken by any party, PNC Bank filed its Motion to Compel Arbitration, invoking arbitration clauses set forth in Financing Agreements into which it had entered with Presbyterian in 2005 and 2006, as well as an arbitration clause in the Intercreditor Agreement between PNC Bank and Infirmary Health.[3]  Presbyterian and Infirmary Health oppose the Motion on several theories, including chiefly that, through its conduct in bringing and litigating this federal lawsuit, PNC Bank has waived its right to enforce the arbitration agreements.  Defendants also argue that the Motion should be denied because, by violating the Intercreditor Agreement in multiple respects, PNC Bank has repudiated that document, precluding it from enforcing the arbitration provision.

---

[3]  While briefing was underway on the Motion to Compel Arbitration, Infirmary Health filed a Motion for Summary Judgment (doc. 59) on the issue of whether PNC Bank has repudiated the Intercreditor Agrement; however, this Court stayed briefing on the Rule 56 motion pending resolution of the motion to compel arbitration.  (*See* doc. 62.)

### C. Relevant Contractual Terms.

PNC Bank points to three contracts containing arbitration clauses, to-wit: a 2005 Financing Agreement between PNC Bank's predecessor and Presbyterian, a 2006 Financing Agreement between the same parties, and the Intercreditor Agreement between PNC Bank's predecessor and Infirmary Health. These are the arbitration provisions that PNC Bank now seeks to enforce via its request that this entire matter be referred to arbitration.

The two Financing Agreements contain virtually identical arbitration clauses providing that "any action, dispute, claim, counterclaim or controversy … between or among [PNC Bank], the Authority, and [Presbyterian], including any claim based on or arising from an alleged tort, shall be resolved by arbitration." (Doc. 56, Exh. B, at 1.) Covered disputes are defined as encompassing "all actions, disputes, claims, counterclaims or controversies arising in connection with the … Bond and Note, … any collection of any indebtedness owed to [PNC Bank], any security or collateral given to [PNC Bank], [and] any action taken (or any omission to take any action) in connection with any of the foregoing." (*Id.*) Pursuant to the Financing Agreements, all such disputes "shall be resolved by binding arbitration in accordance with Title 9 of the U.S. Code and the Commercial Arbitration Rules of the American Arbitration Association." (*Id.*) Two other features of the arbitration clauses in the Financing Agreements warrant mention. First, those provisions specify that "[i]f [Presbyterian] asserts a claim against [PNC Bank] in arbitration or otherwise during the pendency of a claim brought by [PNC Bank] in a court of law, the court action shall be stayed and the parties shall submit to arbitration all claims." (*Id.* at 2.) Second, they provide that "institution or maintenance of an action for judicial relief or pursuit of provisional or ancillary remedies [such as appointment of a receiver] shall not constitute a waiver of the right of any party, including the plaintiff in such an action, to submit the Dispute to arbitration." (*Id.*)

As for the Intercreditor Agreement entered into by PNC Bank's predecessor and Infirmary Health, a detailed arbitration provision may be found at Section 22. That clause provides that "[a]ny controversy, claim or dispute or issue related to or arising from … the interpretation, negotiation, execution, assignment, administration, repayment, modification, or extension of this Agreement; … [or] any breach of any provision of this Agreement, shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association." (Doc. 56, Exh. A at Exh. 44, § 22(a).) The signatories further agreed

that "[a]ny disagreement as to whether a particular dispute or claim is subject to arbitration under this Section shall be decided by arbitration," and that "[c]ommencement of litigation by any person entitled to demand arbitration under this Section shall not waive any right that person has to demand arbitration with respect to any counterclaim or other claim that may be made against that person." (*Id.*)  Finally, with respect to provisional remedies ("such as replevin, injunctive relief, attachment, or appointment of a receiver from a court having jurisdiction"), Section 22 establishes that "[t]he exercise of a remedy shall not waive the right of either Mortgagee to resort to arbitration." (*Id.* at § 22(c).)

**II.     Analysis.**

    *A.     Governing Legal Standard.*

The Federal Arbitration Act ("FAA"), which governs plaintiff's Motion, provides that written agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  In conformity with the FAA, "courts must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms."  *Inetianbor v. CashCall, Inc.*, 768 F.3d 1346, 1349 (11th Cir. 2014) (citations omitted).  "Arbitration is a matter of contract" and "interpretation of an arbitration agreement is generally a matter of state law."  *In re Checking Account Overdraft Litigation MDL No. 2036*, 674 F.3d 1252, 1255 (11th Cir. 2012).  "We must interpret the agreement by reading the words of the contract in the context of the entire contract and construing the contract to effectuate the parties' intent."  *Inetianbor*, 768 F.3d at 1353 (citation and internal quotation marks omitted); *see also Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682, 130 S.Ct. 1758, 176 L.Ed.2d 605 (2010) ("Whether enforcing an agreement to arbitrate or construing an arbitration clause, courts and arbitrators must give effect to the contractual rights and expectations of the parties.") (citation and internal quotation marks omitted).

Significantly, the FAA creates a strong federal policy favoring enforcement of arbitration agreements.  Indeed, "federal courts interpret arbitration clauses broadly where possible," such that "any doubts concerning the scope of arbitral issues should be resolved in favor of arbitration."  *Solymar Investments, Ltd. v. Banco Santander S.A.*, 672 F.3d 981, 988 (11th Cir. 2012) (citations omitted).  "When interpreting an arbitration agreement, due regard must be given to the federal policy favoring arbitration, and ambiguities to the scope of the arbitration

clause itself resolved in favor of arbitration." *Inetienbor*, 768 F.3d at 1353 (citation and internal quotation marks omitted). Of course, "the FAA's strong proarbitration policy only applies to disputes that the parties have agreed to arbitrate." *Klay v. All Defendants*, 389 F.3d 1191, 1200 (11th Cir. 2004).

### B.    Whether Waiver Issue is for Court or Arbitrator to Decide.

Presbyterian and Infirmary Health take the position that the claims joined herein are not arbitrable because PNC Bank has waived its arbitration rights through its conduct in this litigation. Notwithstanding the federal policy favoring arbitration, it is well-settled that "[a]rbitration should not be compelled when the party who seeks to compel arbitration has waived that right." *In re Checking Account Overdraft Litigation*, 754 F.3d 1290, 1294 (11th Cir. 2014) (citation omitted). A critical threshold dispute presented in the parties' briefs concerns whether a court or an arbitrator should decide whether such a waiver has occurred. Via unambiguous holding, the Eleventh Circuit has instructed "that it is presumptively for the courts to adjudicate disputes about whether a party, by earlier litigating in court, has waived the right to arbitrate." *Grigsby & Associates, Inc. v. M Securities Inv.*, 664 F.3d 1350, 1353 (11th Cir. 2011); *see also Plaintiff's Shareholders Corp. v. Southern Farm Bureau Life Ins. Co.*, 486 Fed.Appx. 786, 789 (11th Cir. Aug. 10, 2012) ("questions regarding waiver based on litigation conduct are presumptively for the courts – and not the arbitrators – to decide"). "This presumption leaves the waiver issue to the decisionmaker with greater expertise in recognizing and controlling abusive forum-shopping." *Grigsby*, 664 F.3d at 1354 (citations omitted). "Thus, absent 'clear and unmistakable' evidence of an agreement to the contrary, disputes regarding conduct-based waiver are left to the courts to decide." *Plaintiff's Shareholders*, 486 Fed.Appx. at 789.[4]

Notwithstanding the *Grigsby* presumption, PNC Bank maintains that the conduct-based waiver question is properly submitted to an arbitrator in this case because there is just such "clear and unmistakable" evidence that the parties agreed to arbitrate waiver issues. The evidence upon which PNC Bank relies consists of the following: (i) the language in Section 22 of the Intercreditor Agreement that "[a]ny disagreement as to whether a particular dispute or claim is

---

[4]    Alabama law is consistent with these principles. Indeed, the Alabama Supreme Court has held "that the issue whether a party has waived the right to arbitration by its conduct during litigation is a question for the court and not the arbitrator." *Ocwen Loan Servicing, LLC v. Washington*, 939 So.2d 6, 14 (Ala. 2006).

subject to arbitration under this Section shall be decided by arbitration;" (ii) the language in the Financing Agreements that if Presbyterian brings a claim against PNC Bank during the pendency of a claim brought by PNC Bank in court, "the parties shall submit to arbitration all claims;" and (iii) references in all three agreements to the Commercial Arbitration Rules of the American Arbitration Association ("AAA"). (*See* doc. 56, at 11-14.)[5]

The Court agrees with Infirmary Health and Presbyterian that PNC Bank has not made the necessary showing to overcome the *Grigsby* presumption. The provisions on which PNC Bank relies are general, not specific. They do not reference waiver issues, much less conduct-based waiver issues. Language that the parties agree to arbitrate "all claims" is insufficient because a waiver issue is not a "claim." Similarly, a contractual provision that "[a]ny disagreement as to whether a particular dispute or claim is subject to arbitration" will be submitted to arbitration appears to contemplate arbitrability in its more general sense (*e.g.*, whether a particular claim lies within the scope of the agreed arbitration provision),[6] rather than the very specific context of waiver. And a AAA rule empowering the arbitrator to decide "arbitrability of any claim" likewise appears to refer to a different species of arbitrability, distinct from the specialized question of waiver. Under these circumstances, the undersigned concludes that PNC Bank has not come forward with clear and unmistakable evidence of an agreement by the parties that conduct-based waiver questions were to be decided by the arbitrator; therefore, the *Grigsby* presumption carries the day, and those waiver issues will be decided by this Court. *See, e.g., Plaintiff's Shareholders*, 486 Fed.Appx. at 790 (finding that conduct-based waiver issue is not within scope of AAA Rule 7(a) because it is not an objection to validity of agreement

---

[5] PNC Bank does not identify which of those Commercial Arbitration Rules it deems relevant; however, Rule 7 specifies that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." That same rule provides that "[t]he arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part."

[6] *See Marie v. Allied Home Mortgage Corp.*, 402 F.3d 1, 15 (1st Cir. 2005) (explaining that the term "arbitrability" is one that "encompasses a wide variety of possible meanings, but the most obvious meaning focuses on … whether a particular kind of dispute at issue falls within the scope of the arbitration clause," and that "[m]ost cases that discuss arbitrability focus on these substantive issues").

and that "[m]oreover, Southern Farm is unable to point to (and we are unable to find) any other contractual language that would constitute clear and unmistakable evidence of an agreement to arbitrate issues of conduct-based waiver").[7]

In light of the foregoing, this Court (and not an arbitrator) will decide whether PNC Bank, via its litigation conduct herein, has waived its right to compel arbitration of this action.

### C. Waiver and the Intercreditor Agreement Arbitration Clause.

The Eleventh Circuit applies a two-part test to determine whether a party has waived its right to arbitration. "First, we decide if, under the totality of the circumstances, the party has acted inconsistently with the arbitration right," such as by "substantially invok[ing] the litigation machinery prior to demanding arbitration." *Garcia v. Wachovia Corp.*, 699 F.3d 1273, 1277 (11th Cir. 2012) (citations omitted). Second, the court examines whether those inconsistent actions by the movant have "in some way prejudiced the other party," based on such factors as "the length of delay in demanding arbitration and the expense incurred by that party from participating in the litigation process." *Id.* (citations omitted).[8] That said, "mere delay in asserting a right to arbitrate, without more, does not require a finding of waiver." *Joca-Roca Real Estate, LLC v. Brennan*, 772 F.3d 945, 950 (1st Cir. 2014). "Because federal policy strongly favors arbitration, the party who argues waiver 'bears a heavy burden of proof' under this two-part test." *Krinsk v. SunTrust Banks, Inc.*, 654 F.3d 1194, 1200 n.17 (11th Cir. 2011)

---

[7] *See also Ehleiter v. Grapetree Shores, Inc.*, 482 F.3d 207, 222 (3rd Cir. 2007) ("There are no references to waiver of arbitration in this or any other provision of the Agreement. We cannot interpret the Agreement's silence regarding who decides the waiver issue here as giving the arbitrators that power, for doing so would force an unwilling party to arbitrate a matter he reasonably would have thought a judge, not an arbitrator, would decide.") (citation and internal marks omitted); *Marie*, 402 F.3d at 15 (agreement that arbitrator is to decide "the arbitrability of any such controversy or claim" does not constitute "clear and unmistakable evidence" of intent to have arbitrator decide conduct-based waiver issue, because "[t]here are no references to waiver or similar terms anywhere in the arbitration agreement" and "[n]either party should be forced to arbitrate the issue of waiver by conduct without a clearer indication in the agreement that they have agreed to do so").

[8] *See also Joca-Roca Real Estate, LLC v. Brennan*, 772 F.3d 945, 948 (1st Cir. 2014) ("In determining whether a conduct-based waiver has occurred, we ask whether there has been an undue delay in the assertion of arbitral rights and whether, if arbitration supplanted litigation, the other party would suffer unfair prejudice."); *Campbell v. Verizon Wireless, LLC*, 2015 WL 416484, *7 (S.D. Ala. Jan. 29, 2015) (similar).

(citations omitted).  To vindicate this federal policy favoring arbitration, "waiver is not to be lightly inferred, and will normally be found only where the demand for arbitration came long after the suit commenced and when both parties had engaged in extensive discovery." *In re Pharmacy Ben. Managers Antitrust Litigation*, 700 F.3d 109, 117 (3rd Cir. 2012) (citations and internal quotation marks omitted).

Application of the two-part *Garcia* test in this case is informed by the language of the parties' agreement; indeed, the Court looks to the contracts in the first instance to ascertain what arrangements the parties may have made as to when a conduct-based waiver may occur.  The reason is simple: Arbitration is a matter of contract.  *See Checking Account*, 674 F.3d at 1255.  Pursuant to the Federal Arbitration Act, those contracts are – and must be – rigorously enforced according to their terms.  *See, e.g., Walthour v. Chipio Windshield Repair, LLC*, 745 F.3d 1326, 1329 (11th Cir. 2014) ("Consistent with the FAA's text, courts must rigorously enforce arbitration agreements according to their terms.") (citation and internal quotation marks omitted); *Cat Charter, LLC v. Schurtenberger*, 646 F.3d 836, 843 (11th Cir. 2011) ("The FAA requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms.") (citation and internal quotation marks omitted).  Federal courts are not free to rewrite or disregard particular terms of an arbitration agreement to suit their purposes.  *See, e.g., Checking Account*, 674 F.3d at 1256 (where party asked court to modify provision in arbitration agreement, responding "[t]hat is something we cannot do").[9]  Besides, given that one element of

---

[9] *See also BP Exploration Libya Ltd. v. ExxonMobil Libya Ltd.*, 689 F.3d 481, 496 (5th Cir. 2012) ("for the district court to substitute its own notion of fairness in place of the explicit terms of the parties' agreement would deprive them of the benefit of their bargain just as surely as if the district court refused to enforce their decision to arbitrate") (citation and internal markings omitted); *Williams v. E.F. Hutton & Co.*, 753 F.2d 117, 119 (D.C. Cir. 1985) ("The arbitration agreement is a contract and the court will not rewrite it for the parties."); *Antonio Leonard TNT Productions, LLC v. Goossen-Tutor Promotions, LLC*, 2015 WL 269147, *7 (S.D. Tex. Jan. 21, 2015) ("A court may not rewrite the parties' arbitration agreements."); *Baran Telecom, Inc. v. The Travelers Companies, Inc.*, 2010 WL 1141374, *3 (W.D. Okla. Mar. 22, 2010) ("The court will not rewrite the terms of a contract or arbitration clause to include more favorable terms than the parties included for themselves."); *Ex parte Johnson*, 993 So.2d 875, 885 (Ala. 2008) (where party asked court to decide issue that arbitration agreement reserved for arbitrator, declining "to rewrite the agreements to suit the preference of one of the parties for an immediate judicial determination" because "[s]uch indifference to the unambiguous terms of a written agreement is contradictory to settled principles of Alabama contract law" and "[w]e cannot create unique rules of contract law applicable only to arbitration agreements").

the *Garcia* test is whether the party seeking arbitration has behaved inconsistently with that right, the parameters of conduct authorized in the underlying arbitration agreement are instructive as to whether the movant's conduct was consistent with the arbitration right.

Accordingly, the waiver inquiry as to the arbitration provision in the Intercreditor Agreement properly begins with the relevant contract language.  In that Intercreditor Agreement, PNC Bank and Infirmary Health mutually agreed that "[c]ommencement of litigation by any person entitled to demand arbitration under this Section ***shall not waive any right that person has to demand arbitration with respect to any counterclaim*** or other claim that may be made against that person."  (Doc. 56, Exh. A at Exh. 44, § 22(a) (emphasis added).)  PNC Bank and Infirmary Health likewise agreed that a party's exercise of a provisional remedy (such as applying to a court for appointment of receiver) "shall not waive the right of either Mortgagee to resort to arbitration."  (*Id.* at § 22(c).)

Again, Infirmary Health bears the heavy burden of establishing that PNC Bank waived its right to demand arbitration.  The centerpiece of its argument is that PNC Bank filed suit, moved for appointment of a receiver, and pursued other provisional remedies, all of which activities Infirmary Health insists are inconsistent with the right to arbitrate.  In floating such a theory, Infirmary Health would have the Court disregard the plain language of the Intercreditor Agreement, wherein Infirmary Health agreed that it was not a waiver (i) for PNC Bank to commence litigation only to demand arbitration when another party asserted claims against it, or (ii) for PNC Bank to exercise its rights to provisional remedies such as petitioning a court for appointment of a receiver.  For the reasons stated *supra*, this Court can neither ignore nor effectively erase those terms from the Intercreditor Agreement simply because Infirmary Health now regrets their inclusion.  Having agreed that it was not inconsistent with PNC Bank's right to arbitrate Infirmary Health counterclaims for PNC Bank to commence litigation or to ask a court to impose a provisional remedy such as appointment of a receiver, Infirmary Health cannot persuasively be heard to argue otherwise.

Notwithstanding the foregoing, Infirmary Health seeks to minimize the debilitating effects of Sections 22(a) and 22(c) on its waiver argument.  In particular, Infirmary Health seizes on the word "commencement" from Section 22(a), suggesting that the parties agreed only that filing suit would not constitute a waiver, while remaining silent as to whether actually pursuing said lawsuit after filing it would constitute a waiver.  Applicable precedent highlights the

unreasonableness of construing the arbitration provision as hinging on a filing / pursuing distinction.  *See Conseco Finance Corp.-Alabama v. Salter*, 846 So.2d 1077, 1082 (Ala. 2002) ("It would be meaningless for Salter to agree that Conseco could *file* such an action in the trial court without waiving its right to compel arbitration, but that Conseco could not *pursue* that action without waiving its right to compel arbitration.").  As for Section 22(c), Infirmary Health contends that this provision was intended solely to "ensure[] the process of arbitration *itself* would not extinguish legal remedies." (Doc. 58, at 18.)  The text of Section 22(c) belies such a crabbed, unreasonably narrow construction.  To be sure, subsection (c) begins by specifying that the arbitration clause does not limit a party's ability to seek a provisional remedy such as appointment of a receiver "before, during or after the pendency of any arbitration proceeding."  Had subsection (c) ended there, Infirmary Health might have a point; however, Section 22(c) goes on to clarify that "[t]he exercise of a remedy shall not waive the right of either Mortgagee to resort to arbitration."  That sentence could not be a clearer refutation of Infirmary Health's position that the purpose of Section 22(c) was merely to prevent arbitration proceedings from snuffing out legal remedies.[10]

What all of this means for purposes of the two-part test for waiver of the contractual right to arbitrate is that PNC Bank has not acted inconsistently with the right to arbitrate counterclaims brought by Infirmary Health (which are the only claims directly involving that party, as PNC Bank has asserted no causes of action in law or equity against Infirmary Health).  Again, Infirmary Health and PNC Bank agreed that PNC Bank's act of filing suit would not waive its right to demand arbitration of subsequent counterclaims brought by Infirmary Health.  And Infirmary Health and PNC Bank further agreed that PNC Bank's act of pursuing a provisional remedy like judicial appointment of a receiver would not waive PNC Bank's right to demand arbitration.  By the terms of the Intercreditor Agreement, PNC Bank's conduct in this litigation is not inconsistent with its right to arbitrate the counterclaims brought by Infirmary Health.  Nor has the litigation of Infirmary Health's counterclaims (as to which there has been no discovery

---

[10]  Infirmary Health offers no rejoinder or interpretation of the last sentence of Section 22(c) that might help its cause.  Instead, Infirmary Health asserts that "nowhere in Section 22(c) does 'waiver' appear." (Doc. 56, at 18.)  Perhaps the word "waiver" does not appear in that subsection, but the word "waive" certainly does, in a manner that is both directly on-point and wholly inconsistent with the "waiver" argument propounded by Infirmary Health.

and no motion practice other than Infirmary Health's Motion for Preliminary Injunction that was resolved amicably without judicial involvement) progressed so far as to warrant a finding that PNC Bank unduly delayed after the Infirmary Health counterclaims were filed before moving to compel arbitration.[11]

In sum, the Court is of the opinion that Infirmary Health has failed to meet its heavy burden to establish a conduct-based waiver of PNC Bank's arbitration rights with respect to the Infirmary Health counterclaims. The parties specifically agreed that PNC Bank could file a lawsuit without waiving its rights to arbitrate any counterclaims that Infirmary Health might bring, and that PNC Bank could ask a court to appoint a receiver without waiving its arbitration rights. The Court will neither rewrite nor disregard that prior agreement and understanding between the parties, particularly in the absence of excessive or unreasonable delay by PNC Bank in asserting such arbitration rights after the filing of the Infirmary Health counterclaims.[12]

---

[11] On this point, the court file reflects that Infirmary Health was granted leave to intervene on November 4, 2014 (*see* doc. 33), such that its counterclaims first came into play on that date. While PNC Bank did not move for arbitration until January 29, 2015, there appears to have been minimal activity as to the counterclaims in the interim. It is undisputed that no discovery occurred; furthermore, there was no motion practice related to the counterclaims other than Infirmary Health's request for preliminary injunction that was resolved by agreement of the parties. There is simply no indication that PNC Bank allowed Infirmary Health's counterclaims to proceed in court to such a degree that PNC Bank could reasonably be deemed to have substantially invoked the litigation process as to those counterclaims prior to exercising its arbitration rights. Nor has there been any adjudication of Infirmary Health's counterclaims in these judicial proceedings, such that Infirmary Health's characterization of the Motion to Compel Arbitration as a game of "heads I win, tails you lose" or blatant forum-shopping is inaccurate.

[12] The Court recognizes, of course, that Infirmary Health has presented an alternative argument that the Motion to Compel Arbitration should be denied because PNC Bank effectively repudiated and abandoned the Intercreditor Agreement. The argument, as the Court understands it, is that PNC Bank has repeatedly engaged in material breaches of its obligations under the Intercreditor Agreement, and that "[t]he Court should not allow PNC Bank to cherry pick the provisions of the Intercreditor Agreement that it would like to enforce." (Doc. 58, at 2.) So, Infirmary Health reasons, PNC Bank's breaches of the Intercreditor Agreement disqualify it from being able to enforce any aspect of that agreement (including the arbitration clause set forth in Section 22) against Infirmary Health. This argument amounts to a direct attack against the validity of the arbitration provision (*i.e.*, that PNC Bank has breached the Intercreditor Agreement, rendering the arbitration provision in that Agreement invalid and unenforceable). That, however, is a question for the arbitrator to decide, per the parties' agreement. As noted, Section 22(a) of the Intercreditor Agreement adopted the AAA's Commercial Arbitration Rules. (Continued)

### D. *Waiver and the Financing Agreement Arbitration Clauses.*

Having addressed the Motion to Compel Arbitration as it pertains to the Intercreditor Agreement and the counterclaims of Infirmary Health, the Court now turns to the Financing Agreements and the claims joined herein between PNC Bank and Presbyterian. Recall that in the October 2014 Complaint, PNC Bank asserted claims against Presbyterian for breach of contract and the like, alleging that Presbyterian was in default of certain loan repayment obligations owed to PNC Bank. As part and parcel of those claims, PNC Bank sought immediate appointment of a receiver to take control of the mortgaged real property, Westminster Village. That motion was litigated and ultimately denied via Order entered on November 13, 2014. During the pendency of that motion to appoint receiver, on October 31, 2014, Presbyterian brought counterclaims against PNC Bank on grounds such as conversion, money had and received, negligence and wantonness, all arising from PNC Bank's allegedly improper seizure of financial accounts belonging to Presbyterian. Thus, at present, PNC Bank and Presbyterian have asserted claims against each other for money damages, with PNC Bank also continuing to claim entitlement to appointment of a receiver. PNC Bank now seeks to have all claims and issues joined between it and Presbyterian referred to arbitration in accordance with substantively identical arbitration provisions contained in a pair of underlying Financing Agreements entered into between Presbyterian and PNC Bank's predecessor some years ago.

---

In Rule 7, those Commercial Arbitration Rules specify that "[t]he arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part." Pursuant to the rules expressly adopted by the parties, then, questions going to the validity of the Intercreditor Agreement (which is precisely what Infirmary Health is challenging via its contention that PNC Bank has repudiated / abandoned that entire agreement) are properly submitted to the arbitrator for resolution. The Court therefore expresses no opinion as to whether the arbitration agreement has been invalidated by PNC Bank's alleged breaches, but instead refers that question to arbitration. *See generally Martinez v. Carnival Corp.*, 744 F.3d 1240, 1246 (11th Cir. 2014) ("a court may conclude that the parties agreed to arbitrate the very issue of arbitrability where there is clear and unmistakable evidence that they did so") (citation and internal quotation marks omitted); *Terminix Int'l Co. v. Palmer Ranch Ltd. Partnership*, 432 F.3d 1327, 1332 (11th Cir. 2005) ("By incorporating the AAA Rules, including Rule 8, into their agreement, the parties clearly and unmistakably agreed that the arbitrator should decide whether the arbitration clause is valid.") (citations omitted).

Presbyterian does not challenge the existence of the arbitration agreement, the applicability of the FAA, or the premise that PNC Bank's claims against it are covered by the arbitration agreement. Instead, just as Infirmary Health did in arguing about the arbitration clause set forth in the Intercreditor Agreement, Presbyterian maintains that PNC Bank, through its conduct in this litigation, has waived the right to demand arbitration under the Financing Agreements.[13] Once again, the parties agree that this argument is properly evaluated by reference to the two-pronged test set forth in *Garcia v. Wachovia Corp.*, 699 F.3d 1273, 1277 (11th Cir. 2012), to-wit: (i) whether PNC Bank has acted inconsistently with the right to arbitrate; and (ii) if so, whether PNC Bank's conduct in this litigation has prejudiced Presbyterian.

As with the Infirmary Health waiver objection, the appropriate analytical starting point is the contract language regarding arbitration and waiver issues. One cannot evaluate whether PNC Bank acted inconsistently with its right to arbitration unless one knows the contractual contours of that right (*i.e.*, the provisions stating what PNC Bank could and could not do). Significantly, the Financing Agreements specify that if PNC Bank brings a claim against Presbyterian in a court of law, and Presbyterian subsequently brings a claim against PNC Bank, then "the court

---

[13] In addition to asserting a conduct-based waiver defense to the Motion to Compel Arbitration, Presbyterian references the Intercreditor Agreement and states that "PNC Bank has repudiated the arbitration clause it seeks to enforce." (Doc. 61, at 2, 7.) This argument is a non-starter for Presbyterian, which was not a party to the Intercreditor Agreement. PNC Bank is not seeking to enforce the Intercreditor Agreement's arbitration clause as to the claims and issues joined between PNC Bank and Presbyterian; rather, as to those claims, PNC Bank seeks to enforce the arbitration provisions in the Financing Agreements entered into between PNC Bank and Presbyterian. Presbyterian does not suggest that PNC Bank has repudiated the Financing Agreements; therefore, its repudiation argument is misplaced. Presbyterian's reasoning is, apparently, that the claims between PNC Bank and Presbyterian and those between PNC Bank and Infirmary Health are "inextricably intertwined," such that all of these claims must travel together, whether in arbitration or in litigation. (*See* doc. 61, at 8-9.) As an initial matter, it is far from obvious that all claims and causes of action joined herein are inextricably intertwined with each other. Besides, arbitration need not be an all-or-nothing proposition, given the variation in both the claims presented and the arbitration clauses governing particular claims and issues. More generally, if Presbyterian intends to hitch its wagon to Infirmary Health on the arbitration question by insisting that all claims travel together, then this argument would actually undercut Presbyterian's opposition to the Motion to Compel Arbitration because, as discussed *supra*, the Court has already referred the PNC Bank / Infirmary Health claims to arbitration, subject to the arbitrator making a threshold determination about the validity of Section 22 of the Intercreditor Agreement (*i.e.*, the repudiation / abandonment argument).

action shall be stayed and the parties shall submit to arbitration all claims." (Doc. 56, Exh. B, at 2.) Furthermore, the Financing Agreements include a provision under which PNC Bank and Presbyterian agreed that "institution or maintenance of an action for judicial relief or pursuit of provisional or ancillary remedies shall not constitute a waiver of the right of any party, including the plaintiff in such an action, to submit the Dispute to arbitration." (*Id.*)

These contractual terms undermine Presbyterian's position on the Motion to Compel Arbitration. For example, Presbyterian posits that "PNC Bank sealed its choice to reject arbitration by filing this litigation, waiving any right to compel arbitration" and that "PNC Bank waived arbitration by filing the PNC Bank Complaint." (Doc. 61, at 10-12.) But Presbyterian had previously agreed that PNC Bank's institution of litigation against it or pursuit of provisional remedies such as appointment of a receiver would <u>not</u> constitute a waiver. Similarly, Presbyterian balks that PNC Bank sought "extraordinary judicial relief from this Court, and then revert[ed] to the cover of arbitration when it dislike[d] the results." (*Id.* at 3.) Once again, the relevant arbitration provisions (to which Presbyterian assented) authorized PNC Bank to seek extraordinary judicial relief in court, without waiving its rights to demand arbitration. More broadly, by moving to compel arbitration now, PNC Bank is doing precisely what the arbitration provisions in the Financing Agreements contemplated. The parties' agreement specified that if PNC Bank were to sue Presbyterian, and if Presbyterian were subsequently to bring claims against PNC Bank, then the court action was to be stayed and "all claims" were to be referred to arbitration. Thus, PNC Bank's Motion to Compel Arbitration would merely effectuate that which the parties' agreement said was supposed to happen.

The point is straightforward. Applicable law requires Presbyterian (as the party seeking a determination of waiver of the arbitration provisions) to establish that PNC Bank acted inconsistently with its right of arbitration. The relevant contract terms establish the opposite. Presbyterian and PNC Bank agreed that PNC Bank could bring a court action for judicial relief and/or provisional remedies such as appointment of a receiver without waiving its right to arbitrate. They further agreed that if Presbyterian brought claims against PNC Bank during the pendency of such a court action, the entire court action should be stayed at that point and all

claims should be referred to arbitration.  PNC Bank's conduct is fully consistent with these arbitration provisions and, hence, with its right to arbitrate.[14]

---

[14]  Presbyterian offers several arguments to the contrary, none of which resonate. First, Presbyterian urges the Court to "reject PNC Bank's construction of the arbitration language" (doc. 61, at 8) as being inequitable.  In so advocating, Presbyterian likens this situation to the undersigned's decision to override contract language by declining to appoint a receiver.  The analogy is ill fitting.  Appointment of a receiver is an extraordinary, disfavored equitable remedy; meanwhile, referral of disputes to arbitration is backed by a broad federal policy of enforcing arbitration agreements.  Unlike in the case of agreements consenting to receivership, courts rigorously enforce arbitration agreements in accordance with their terms. *Compare F.D.I.C. v. Vernon Real Estate Investments, Ltd.*, 798 F. Supp. 1009, 1012 (S.D.N.Y. 1992) ("the court has the discretion to deny appointment of a receiver under the appropriate circumstances even though the mortgage provides the mortgagee a specific right to an appointment") *with Walthour v. Chipio Windshield Repair, LLC*, 745 F.3d 1326, 1329 (11th Cir. 2014) ("courts must rigorously enforce arbitration agreements according to their terms"). Second, Presbyterian argues that PNC Bank did not demand arbitration at the earliest possible moment after Presbyterian's counterclaims were filed, but instead waited until after preparing the report of parties' planning meeting, exchanging initial disclosures, and so on.  (Doc. 61, at 3, 12-13.)  However, decisional authorities emphasize that "[t]here are no *per se* rules as to the length of delay necessary to amount to waiver" and that "[t]he length of delay must be evaluated in the context of litigation activities engaged in during that time." *Restoration Preservation Masonry, Inc. v. Grove Europe Ltd.*, 325 F.3d 54, 61 (1st Cir. 2003); *see also Joca-Roca*, 772 F.3d at 950 ("mere delay in asserting a right to arbitrate, without more, does not require a finding of waiver").  From the time that Presbyterian filed counterclaims on October 31, 2014 (thereby triggering the contractual provision that the court action should be stayed and the matter referred to arbitration) until PNC Bank moved to compel arbitration on January 29, 2015, PNC Bank did little to invoke the machinery of litigation.  During that interval, PNC Bank merely participated in the parties' planning meeting, contributed to the Rule 26(f) report, filed a brief in opposition to a motion for preliminary injunction, and agreed to a consent resolution of said motion.  That's all.  Such activities are insufficient to constitute substantial invocation of litigation, as necessary to overcome the presumption against waiver. *See, e.g., Coca-Cola Bottling Co. of New York, Inc. v. Soft Drink and Brewery Workers Union Local 812*, 242 F.3d 52, 57-58 (2nd Cir. 2001) ("neither filing an answer nor waiting four months to seek arbitration was sufficient to constitute a waiver"); *Subway Equipment Leasing Corp. v. Forte*, 169 F.3d 324, 326 (5th Cir. 1999) (noting "strong presumption against waiver of arbitration").  Third, Presbyterian argues that PNC Bank failed to list the arbitration clause as an affirmative defense to any counterclaims; however, such an omission does not mandate a finding of waiver. *See Hill v. Ricoh Americas Corp.*, 603 F.3d 766, 771 (10th Cir. 2010) (rejecting argument that movant "forfeited its right to demand arbitration by not asserting that right as an affirmative defense in its answer"); *Forrester v. Penn Lyon Homes, Inc.*, 553 F.3d 340, 343 (4th Cir. 2009) ("simply failing to assert arbitration as an affirmative defense does not constitute default of a right to arbitration").

Ultimately, PNC Bank has done nothing more than what Presbyterian agreed in the Financing Agreements that PNC Bank could do. It came to federal court requesting appointment of a receiver as a provisional remedy which, according to the parties' contract, does not constitute a waiver of arbitration rights. Later, when Presbyterian asserted counterclaims against it, PNC Bank within a reasonable time invoked the contractual provision that the federal litigation should be stayed and all claims referred to arbitration. PNC Bank has acted consistently with the arbitration provisions of the Financing Agreements; therefore, it cannot be said to have conducted itself inconsistently with its right to arbitration. On that basis, the Court concludes that Presbyterian has not satisfied its heavy burden of establishing that PNC Bank has waived its right to arbitrate the claims and issues joined herein between PNC Bank and Presbyterian. All such claims and issues will be referred to arbitration.[15]

### III. Conclusion.

The Federal Arbitration Act "embodies a liberal federal policy favoring arbitration agreements." *Hill v. Rent-a-Center, Inc.*, 398 F.3d 1286, 1288 (11th Cir. 2005) (citation and internal quotation marks omitted). While such arbitration rights may be waived, the party seeking to establish such a waiver bears a heavy burden. Here, the parties opposing arbitration – Infirmary Health and Presbyterian – cannot satisfy that burden. They are sharply critical of PNC Bank's litigation conduct; however, PNC Bank did exactly what its arbitration agreements with

---

[15] In so concluding, the Court considers and rejects Presbyterian's cursory contention that its "counterclaims (the conversion of donor or otherwise restricted funds) lie outside the scope of [Presbyterian]'s contracts with PNC Bank and are not subject to any arbitration provision." (Doc. 61, at 2.) The arbitration provisions in the Financing Agreements expressly cover "all actions … arising in connection with the … Bond and Note, … any collection of any indebtedness owed to [PNC Bank], … [and] any action taken … in connection with any of the foregoing." (Doc. 56, Exh. B, at 1.) Presbyterian's counterclaims – alleging that PNC Bank wrongfully converted its assets to collect on the outstanding indebtedness – fit comfortably within that defined range of claims the parties agreed to submit to arbitration. Likewise, Presbyterian's purported "substantive defense" that it "demanded a jury trial on its counterclaims" is unavailing. (Doc. 61, at 7.) Where a party has agreed to submit its claims to arbitration, the right to a jury trial must yield. *See, e.g., Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1371 (11th Cir. 2005) ("where a party enters into a valid agreement to arbitrate, the party is not entitled to a jury trial or to a judicial forum for covered disputes"); *American Heritage Life Ins. Co. v. Orr*, 294 F.3d 702, 711 (5th Cir. 2002) ("The Seventh Amendment right to a trial by jury is limited by a valid arbitration provision that waives the right to resolve a dispute through litigation in a judicial forum.").

these parties allowed it to do.  The Court cannot rewrite or refashion the terms of those arbitration agreements, which were negotiated and entered into by sophisticated business entities, merely because certain parties now dislike the foreseeable consequences of same.

For all of the foregoing reasons, it is **ordered** as follows:

1. PNC Bank's Motion to Compel Arbitration (doc. 56) is **granted in part**, and **denied in part**;
2. PNC Bank's request to have the question of litigation conduct-based waiver be referred to the arbitrator is **denied**;
3. In all other respects, the Motion to Compel Arbitration is **granted**;
4. The Court finds that PNC Bank, through its litigation conduct, has not waived its right to arbitrate all disputes joined in this litigation with Presbyterian and Infirmary Health, and that (subject to paragraph 5, below) all such disputes are properly referred to arbitration at this time in accordance with the written arbitration agreements;
5. The Court finds that the threshold questions of whether PNC Bank has repudiated or abandoned the Intercreditor Agreement through its alleged violations of same, and whether any such violations invalidate the arbitration provision found at Section 22, are properly referred to arbitration pursuant to Rule 7 of the Commercial Arbitration Rules of the AAA, to which all parties agreed;
6. The issues identified in paragraphs 4 and 5 are hereby **referred** to binding arbitration in accordance with the parties' agreements;
7. There being no remaining issues for litigation in these court proceedings, this action is **stayed** pending arbitration.  To keep the Court apprised of developments in the arbitral proceedings, PNC Bank is **ordered** to file, on or before the **fourth Tuesday of each month**, a written report reflecting the status of the arbitration proceedings.  The first such report is due on or before **May 26, 2015**; and
8. Plaintiff's Motion to Stay Deadlines (doc. 65) is **moot**.

DONE and ORDERED this 28th day of April, 2015.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE